No. 101,458

STATE OF KANSAS, *Appellee*, v. CHRISTOPHER M. LOWRANCE, *Appellant*.

(312 P.3d 328)

Opinion filed November 8, 2013.

*Sarah Ellen Johnson,* of Capital Appellate Defender Office, argued the cause and was on the brief for appellant.

*Kristafer R. Ailslieger,* deputy solicitor general, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.: A jury convicted Christopher M. Lowrance of capital murder under K.S.A. 21-3439(a)(4) for the intentional and premeditated killing of Rachel Dennis in the commission of, or subsequent to the commission of, attempted rape. We affirm Lowrance's conviction, holding: (1) The prosecutor did not commit reversible misconduct in closing argument by commenting on the defense expert's compensation or in drawing reasonable inferences from forensic evidence; (2) the trial judge's removal of a juror did not cause substantial prejudice; (3) the trial judge did not err in allowing the prosecution to introduce evidence of Lowrance's prior, premarital sexual relationship because the evidence was relevant, not prohibited by K.S.A. 60-447 as contended by Lowrance, and not unduly prejudicial; (4) the trial judge did not err in admitting opinion testimony of a lay witness regarding Lowrance's state of mind because the testimony satisfied the criteria of K.S.A. 60-456; (5) there was sufficient evidence for a rational factfinder to convict Lowrance of capital murder; and (6) cumulative error did not deprive Lowrance of his right to a fair trial.

## FACTS AND PROCEDURAL BACKGROUND

On the evening of March 1, 2007, Lowrance went to a party at Cole Osborne's house in Coffeyville. Dennis was also at the party.

Around 4 a.m., Lowrance left the party, walked to his house to get his car, and drove back to Osborne's house. Dennis, who had gotten "pretty drunk" at the party, had fallen asleep. Osborne planned to let her sleep, but Lowrance was "pretty persistent on taking her home." Lowrance shook Dennis awake and helped her stand up. He held her upright as she stumbled to his car, where he helped her into the front passenger seat. One of the other people at the party, Ramsey Aduddell, testified he thought that Lowrance was "trying to get some," meaning that Lowrance planned to have a sexual encounter with Dennis.

Vicki Lowrance, Lowrance's wife, heard him arrive home around 5:50 a.m. on March 2. When Vicki left for work at 10 a.m., she drove the same car as the one Lowrance had used to drive Dennis from the party. Because there was mud on the car, Vicki stopped by the car wash on the way to work. She noticed what looked like vomit in the front seat of the car, and she tried to clean it up using Windex and a shop rag. When she opened the front passenger door, she saw a cell phone charger between the door and the seat.

Later that day, Lowrance told Osborne about his actions after he left the party. He stated that Dennis "had gotten sick in his car, and he went up to [the convenience store] to clean out his car, and she wanted something to drink, and she had went in and came out with a guy and got in a black truck." Lowrance gave law enforcement officers the same account when they questioned him after Dennis was reported missing. Following up on the interview, an officer checked the convenience store's surveillance video and found images of Lowrance in the store but no images of Dennis. The officers interviewed Lowrance again, and he repeated the same account. Lowrance gave the officers a cell phone charger that he said Dennis had left in his car and a polo shirt he told them he had worn the night of the party. This shirt did not match the one Lowrance was seen wearing in the surveillance video.

On March 7, 2007, officers searched Lowrance's house and seized his car. Lowrance was interviewed again on March 9, 2007, in the presence of his attorney. In this recorded interview, he repeated what he had previously told officers. In addition, he specifically stated that he stayed in his car while Dennis went inside

the convenience store. He also admitted he had been very intoxicated and should not have been driving, but he denied knowing where Dennis was and denied doing anything to hurt her.

On March 13, 2007, Lowrance and his attorney viewed the convenience store video in the presence of law enforcement officers. After seeing that the video showed Lowrance entering the store, walking to the counter, making a purchase, and leaving, Lowrance and his attorney privately conferred. Approximately 7 to 10 minutes later, the attorney advised the officers that Lowrance would direct them to a location where they might find Dennis' body.

Lowrance directed a detective to a bridge located approximately 10 miles north of Coffeyville. As they drove closer to the bridge, Lowrance became more nervous, started crying, and apologized to the detective. He admitted to throwing Dennis from the bridge into the river. Lowrance asked the detective to apologize to Dennis' family on his behalf and made several comments about having lied to everyone and wishing he had just told the truth from the beginning. After they got to the bridge, Lowrance became so emotionally upset he had to be removed from the scene. On the way back to the sheriff's department, Lowrance admitted to throwing Dennis' purse into the river as well.

Dennis' body was found snagged on a partially submerged tree 350 yards downstream from the bridge. A cell phone charger cord was wrapped tightly around her neck and tied in a tight knot. Lowrance was charged with capital murder under K.S.A. 21-3439(a)(4) for the intentional and premeditated killing of Dennis in the commission of, or subsequent to the commission of, attempted rape.

At Lowrance's trial, several witnesses described the river, the bridge, the location where Dennis' body was found, and the condition of her body. They described that the water level was below normal and was flowing approximately 47 feet under the bridge. At the point where Dennis' body was recovered, the surface velocity of the river was slower than other parts of the river. Dennis' upper body was clothed with several layers, including a partially zipped jacket, but there was no clothing covering any part of her body from the waist down. She still wore a necklace and had rings on one finger and on one toe, and an earring was found in the front

part of her bra. Dennis' right shoe, with the shoelaces still tightly tied, was recovered approximately 150 yards downstream from the bridge. Dennis' purse, pants, panties, and left shoe were never found.

Dr. Donald Pojman, the deputy coroner for Montgomery County and several other counties, performed the autopsy of Dennis. He testified Dennis' blood-alcohol level was twice the legal limit. In detailing his other findings, he noted that Dennis' body was mildly decomposed from being in the river for 11 days and that there were color changes in certain areas of the body related to that decomposition. Dr. Pojman found an impression in the front of Dennis' neck, a few small hemorrhages under the cord around her neck, and hemorrhaging on her voice box; he attributed these injuries to strangulation. He also found a small hemorrhage on Dennis' head and a larger hemorrhage near her collar bone. He explained that the presence of hemorrhages indicated trauma before death. In discussing the hemorrhage near the collar bone, Dr. Pojman opined that the injury was "just possibly from" ligature strangulation, manual strangulation, or from "someone restraining someone while they're putting on the ligature." He found no obvious contusions or lacerations of Dennis' genital area, although there were dark red skin lesions on the lower extremities and pelvic region that were likely the result of contusions suffered before death. He also observed lacerations to the liver and found 200 milliliters of blood in the stomach cavity. He indicated the liver injury was severe, was of a nature that would typically be caused by blunt force trauma, and had occurred before death, as indicated by blood clotting observed in the lacerations. While Dr. Pojman indicated the liver injury would be life threatening, he did not believe it was the cause of death. Instead, he concluded that Dennis died from asphyxiation or lack of oxygen due to ligature strangulation from the cord wrapped around her neck.

Additional forensic evidence was presented to the jury through the testimony of Barbara Crim-Swanson, a forensic scientist with the Kansas Bureau of Investigation, who had processed Lowrance's car. She discovered a red-brown stain on the doorjamb of the passenger side of the car; a sample from the stain tested positive for

blood. She also obtained samples from the lower portion of the front passenger seat at a point where the passenger's lower back would typically rest against the seat; she described these samples as "biological material." She also pointed to these stains in photographs taken of the seat, noting three "reddish-brown" or "red-brown" areas. DNA testing could not exclude Dennis as a possible contributor of either the sample taken from the doorjamb or those taken from the passenger seat. The frequency of the DNA profile occurring at random in the general Caucasian population was estimated at 1 in 6 quintillion. Crim-Swanson also received the sexual assault kit from the autopsy to test for the presence of any seminal fluid; none was found.

The State also called Rebecca Miller, Lowrance's former girlfriend, to testify regarding her sexual relationship with Lowrance prior to his 2004 marriage. She testified that they would occasionally drive to a location near the river to engage in consensual sex in Lowrance's car. Rebecca showed a law enforcement officer the location where they would go; the officer testified the location was approximately 3.1 miles from the bridge where Lowrance said he threw Dennis' body into the river. Rebecca explained that they would use the front passenger side and she would undress only from the waist down.

Lowrance testified in his defense at trial. He told the jury there was a gap in his memory regarding what occurred during and after the party. He remembered heavily drinking, smoking a couple of joints of marijuana, and taking Xanax while at the party. But he did not remember the early morning hours or leaving the party. His first postparty memory was of him sitting in his car near an alley behind Dennis' home and seeing Dennis in the passenger seat with the cord tied tightly around her neck. He explained that although he did not take her pulse, he knew she was dead. He panicked and decided he should "get rid of her." He remembered the route he drove, stopping on the north side of the bridge, getting out of the car, and opening the passenger side door. Dennis' body, which Lowrance described as "limp," fell partially out of the car. Lowrance picked up Dennis and threw her and then her purse over the bridge railing and into the river. He testified that Dennis was fully

clothed when he threw her over the bridge. Lowrance admitted to the jury that the story about the white male and the black truck at the convenience store was a lie he made up because he was scared. He denied raping or killing Dennis.

Lowrance also presented the testimony of his own expert, Dr. Thomas Young, a forensic pathologist. Dr. Young's opinions were based on his review of investigative reports, the autopsy report, and photographs of Dennis' body. He disagreed with Dr. Pojman's conclusion that ligature strangulation was the cause of death because, in his opinion, a person who is strangled will struggle, resulting in injuries that Dennis did not have. He also testified, however, that ligature strangulation could have been the cause of death if Dennis had been unconscious and someone tied the cord around her neck without a struggle. Dr. Young also disagreed with Dr. Pojman regarding the bruising on the front of Dennis' legs. Dr. Young testified the discolorations were caused by decomposition and the blood settling as Dennis floated in the river. In addition, he testified he believed the liver lacerations could have been caused by the fall from the bridge after Dennis was dead. In his opinion, there would have been more bleeding if the injury had occurred while Dennis was alive. Ultimately, Dr. Young did not explain the cause of Dennis' death, although he did say that none of the observed injuries explained her death and that it was possible she died from the side effects of drugs that were not covered in the autopsy drug screen.

The jury found Lowrance guilty of capital murder as charged. Lowrance was sentenced to life imprisonment. He timely appealed his conviction, and this court has jurisdiction pursuant to K.S.A. 22-3601(b)(1) (maximum sentence of life imprisonment imposed).

## Issue 1: The Prosecutor Did Not Commit Reversible Misconduct

In his first issue on appeal, Lowrance argues the prosecutor committed misconduct during closing arguments by making two misstatements. One of the alleged misstatements related to the prosecutor's comments about the fees paid to the defense's expert, Dr.

Young, and the other related to the physical evidence of blood in the car.

*Standard of Review*

Review of alleged prosecutorial misconduct involves a two-step process. An appellate court first determines whether the comments were outside the wide latitude that a prosecutor is allowed in discussing the evidence. If the comments are found to be improper and therefore misconduct, the court next determines whether the comments prejudiced the jury against the defendant and denied the defendant a fair trial. *State v. Marshall*, 294 Kan. 850, 856, 281 P.3d 1112 (2012); *State v. Tosh*, 278 Kan. 83, 85, 91 P.3d 1204 (2004). In this step of the process, we consider three factors: First, was the misconduct gross and flagrant? Second, was the misconduct motivated by ill will? Third, was the evidence of such a direct and overwhelming nature that the misconduct would likely have had little weight in the mind of a juror? None of these three factors is individually controlling. *Marshall*, 294 Kan. at 857; *State v. Raskie*, 293 Kan. 906, 914, 269 P.3d 1268 (2012).

In assessing this third factor, this court requires that any prosecutorial misconduct error meet the "dual standard" of both constitutional harmlessness and statutory harmlessness to uphold a conviction. See *Tosh*, 278 Kan. at 97 (Before third factor can ever override first two factors, an appellate court must be able to say that the harmlessness tests of both K.S.A. 60-261 and *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 [1967], have been met.).

Under both standards, the party benefiting from the error— here, the State—bears the burden of demonstrating harmlessness. *State v. Bridges*, 297 Kan. 989, 306 P.3d 244, 260 (2013); *State v. Herbel*, 296 Kan. 1101, 1110, 299 P.3d 292 (2013). That burden is more rigorous when the error is of constitutional magnitude. See *Herbel*, 296 Kan. at 1110. In other words, if the State has met the higher *Chapman* constitutional harmless error standard it necessarily has met the lower standard under K.S.A. 60-261. Hence, we need conduct our analysis only under the *Chapman* harmless error standard, under which

"the error may be declared harmless where the party benefitting from the error proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict." *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

See *State v. Ochs*, 297 Kan. 1094, 306 P.3d 294, 299 (2013) (citing *Herbel*, 296 Kan. at 1110-11).

### A. *Comments on Expert Fees*

The first alleged instance of misconduct occurred when the prosecutor commented on the opinions offered by the State and defense experts and, in the process, referred to the fees the two experts charged. The topic of defense expert Dr. Young's fees had been raised during the State's cross-examination when the prosecutor asked Dr. Young if he was paid for his analysis and time in court, how much time he had billed, and how much he charged per hour. Dr. Young answered that he charged $300 per hour and that he was not sure how much time he had spent on the case. In contrast, there had been no evidence admitted about the terms of Dr. Pojman's service as a deputy county coroner or his compensation.

The topic of fees arose again during closing arguments. The prosecutor compared the defense's and State's experts, continuously pointing out that Dr. Young charged $300 per hour. He also stated:

"So we have Dr. Young and Dr. Pojman both saying ligature strangulation of a nonstruggling victim, both the same thing. You know, the Cross I did of the Defendant was pretty long, but the Cross I did of Dr. Young was pretty short. Why should I have to Cross-Examine him because this is what the deal is. The Defense paid $300 per hour big bucks to get Dr. Young in here. I got what I wanted to for free, because they're both saying ligature strangulation of a non-struggling victim."

Focusing on the last sentence, Lowrance argues the prosecutor misled the jury into believing that Dr. Pojman provided his services and testimony for free.

Commenting on an expert witness' fee is not, of itself, misconduct. As we recently reiterated in *State v. Wells*, 297 Kan. 741, 752,

305 P.3d 568 (2013), " '[e]xposing the bias or motive for testifying is a proper subject for cross-examination,' " and, " 'by extension, the prosecutor is free to argue this point to the jury if the evidence has established the facts' " (quoting *State v. Jones*, 273 Kan. 756, 783, 47 P.3d 783, *cert. denied* 537 U.S. 980 [2002]). In that case, like this one, Dr. Young had testified for the defense. There, he knew his total fee was $3,500. In closing, the prosecutor asked the jury whether there were "at least $3,500 worth of reasons" for why Dr. Young testified that victim's death was accidental. We held that "the prosecutor's closing comments about [Dr.] Young tread very close to the error line but did not cross it." 297 Kan. at 752.

This case presents a different situation because, as the State concedes, there was no evidence regarding Dr. Pojman's fees and the statement—"I got what I wanted for free, because they're *both* saying"—indicates both Dr. Pojman and Dr. Young provided an opinion for free. (Emphasis added.) The State also admits that evidence at a posttrial hearing established that Dr. Pojman had been compensated for his work on the case. In light of these admissions, the State concedes there was misconduct because the prosecutor made a statement for which there was no evidentiary support. See *State v. Ly*, 277 Kan. 386, Syl. ¶ 4, 85 P.3d 1200 ("The fundamental rule for closing arguments is that the prosecutor must confine his or her remarks to matters in evidence. It is clearly improper for the prosecutor to state facts that are not in evidence."), *cert. denied* 541 U.S. 1090 (2004); *State v. Pabst*, 268 Kan. 501, 506, 996 P.2d 321 (2000) (prosecutor " 'should not intentionally misstate the evidence or mislead the jury as to the inferences it may draw' ").

Consequently, we move to the second step and apply its three factors to analyze whether the prosecutor's comment prejudiced the jury against the defendant and denied the defendant a fair trial. In regard to the first factor of whether the misconduct was gross and flagrant, there is no question that every prosecutor should know that he or she cannot make arguments for which there is no evidentiary support. As a result, the statement was a flagrant violation of long-standing, unequivocal precedent. See *Marshall*, 294 Kan. at 861. As to the second factor, we find no evidence of ill will.

Likewise, the third factor weighs against a conclusion that the misconduct requires us to reverse Lowrance's conviction. Any prejudice to Lowrance caused by the prosecutor's comment is vastly overshadowed by the damaging nature of Dr. Young's concession that the evidence supported the State's theory of death—strangulation of a nonstruggling victim. Moreover, considerable physical evidence supported this opinion, which was shared by Dr. Pojman. Given this, when the prosecutor's comment is considered in light of the evidence as a whole, we conclude it was not reasonably possible that the comment contributed to the verdict.

Hence, while we find misconduct, we conclude it does not warrant reversing Lowrance's conviction.

### B. *Evidence of Blood*

Lowrance also argues the prosecutor committed misconduct in closing arguments when he stated, "Well, the vomit story doesn't really work because you've got DNA that shows it's blood. One in six quintillion, so the vomit story is not working." Lowrance contends this is a misstatement of the physical evidence because the forensic expert never stated that the biological material found in the car was definitely and exclusively blood. The State claims the statement was not a misstatement of evidence because the forensic expert testified that the chemical testing indicated the stains in the car were blood.

Both contentions are partially accurate. The forensic expert only stated that the stain found on the doorjamb tested positive for blood. Whether the doorjamb is "in" the car may be subject to debate, and the context of the statement suggests the prosecutor was not referring to the testing performed on the doorjamb but was focusing on samples taken from the passenger seat. Yet, in discussing the inspection of the passenger seat and the testing of the samples taken from the seat area, the forensic expert never stated the testing established that the stains were blood. Rather, she generically referred to the stains on the seat as "biological material." Further, she never excluded vomit as the source of the biological material. And there was no evidence that DNA testing established that the stains on the seat were blood, merely that the

DNA testing established that Dennis could not be excluded as the source of the biological material.

Nevertheless, "a prosecutor is permitted to draw reasonable inferences from the evidence and is given latitude in drawing those inferences." *State v. Stano*, 284 Kan. 126, 151, 159 P.3d 931 (2007). Here, the evidence creates a reasonable inference that the stains were blood.

At the beginning of the forensic expert's testimony, she explained that she had searched the car "to look for any possible blood staining that might be present." She then described a three-step process for testing "areas that appear[] to possibly have suspicious stains for blood." She explained that if the preliminary steps of the process result in a positive test for blood, she collects samples for further lab analysis. Turning to the various stains she found in Lowrance's car, she walked through each step in the processing of the doorjamb and specifically indicated the field test was positive for blood. She then was asked whether she "identified" areas on the front passenger seat. She answered that she had, she described the areas where there was "staining," and she indicated that she collected samples from those areas. She was not asked and she never stated that the testing of the seat stains revealed blood. Nevertheless, in context, the clear implication of her testimony was that there were blood stains on the seat.

In addition, the forensic expert was shown photographs of the doorjamb and passenger seat. She described the stains in each photograph as "reddish-brown" or "red-brown," and the jury could see from the photos that the stains were consistent with blood and with one another. Further, DNA testing confirmed it was highly probable that Dennis was the source of the biological material on the seat. Finally, we note it was appropriate for the State to ask the jury to infer from the lack of evidence of vomiting that Lowrance's "story" was untrue, just as Lowrance argued the lack of evidence of seminal fluid meant the State's charge of attempted rape had no evidentiary support.

We conclude the prosecutor's comment contained fair inferences that could be drawn from the evidence and was not outside the latitude allowed in argument.

## ISSUE 2: REMOVAL OF JUROR WAS NOT PREJUDICIAL

Next, Lowrance argues the trial judge erred in removing a juror because the juror made a note during the trial. Lowrance contends that the judge did not specifically instruct the jury it could not take notes; therefore, the juror did not violate the judge's admonitions and the judge did not have reasonable cause to dismiss the juror.

In considering this argument, it is important to note that a defendant has no right to any particular juror or to the original 12 jurors empanelled to hear the case. *State v. Stafford*, 255 Kan. 807, 823, 878 P.2d 820 (1994); *State v. Stallings*, 246 Kan. 642, 646, 792 P.2d 1013 (1990); *State v. Haislip*, 237 Kan. 461, 468, 701 P.2d 909, *cert. denied* 474 U.S. 1022 (1985). Furthermore, it is well established that the decision to discharge a juror lies within the sound discretion of the trial judge. See K.S.A. 22-3412(c); *State v. Martinez*, 288 Kan. 443, 446, 204 P.3d 601 (2009); *State v. Jones*, 283 Kan. 186, Syl. ¶ 6, 151 P.3d 22 (2007); *Stallings*, 246 Kan. at 646; *State v. Folkerts*, 229 Kan. 608, 616, 629 P.2d 173, *cert. denied* 454 U.S. 1125 (1981). "The defendant carries the burden of demonstrating substantial prejudice before an appellate court will find that the trial court abused its discretion." *Martinez*, 288 Kan. at 446.

In addressing the requirement of showing substantial prejudice, Lowrance points out that the removal occurred on the same day that he and the defense expert testified. He asserts an entitlement to a jury that was not distracted on a key day of trial. Yet, we find nothing in the record to indicate the manner in which the juror's removal was handled or the loss of one juror and the substitution of an alternate distracted the jury in any manner. Because we find no indication of any prejudice—much less substantial prejudice—to Lowrance, we reject his request to reverse his conviction because of the judge's action. Given this conclusion, we need not discuss his other arguments on this issue.

## ISSUE 3: PREMARITAL SEXUAL RELATIONSHIP WAS RELEVANT

In Lowrance's next issue, he contends the trial judge erred in admitting the testimony of Miller, his former girlfriend, regarding her consensual sexual relationship with him.

In pretrial motions, the State moved to allow Miller's testimony as relevant to the attempted rape charge. Lowrance responded with two arguments. First, he represented that his relationship with Miller began before his marriage and continued after he was married and, therefore, the trial judge should deny the motion under K.S.A. 60-455 as an inadmissible prior act of misconduct—adultery. In response to this argument, the State agreed to confine the questions to Lowrance's sexual relationship with Miller prior to Lowrance's marriage. Lowrance's second argument was that the evidence was improper character evidence under K.S.A. 60-447.

The trial judge granted the State's motion, finding the evidence was probative. The judge noted that the river location frequented by Lowrance and Miller and the location where Lowrance threw Dennis into the river "crosses over sufficiently for the Court to see similarities with the particular victim in this case, the manner in which it occurred, location, vehicle involved that night, et cetera." At trial, defense counsel renewed Lowrance's objection, and the judge again ruled the testimony was admissible.

Before this court, Lowrance argues that the trial judge erred in allowing the testimony of his former girlfriend because it was irrelevant evidence and was improper character evidence prohibited by K.S.A. 60-447. Notably, he does not reassert an argument under K.S.A. 60-455, presumably because there was no evidence admitted that the relationship was adulterous.

## A. Relevance

Lowrance's first argument requires an examination of the first step of any evidentiary admissibility issue: Is the evidence relevant? *State v. Shadden*, 290 Kan. 803, 817, 235 P.3d 436 (2010). This threshold question must be asked because all relevant evidence is admissible unless prohibited by statute. K.S.A. 60-407(f). To determine if evidence is relevant a trial judge must evaluate whether there is a material or logical connection between the asserted facts and the inference or result the facts are intended to establish. *State v. Ultreras*, 296 Kan. 828, 857, 295 P.3d 1020 (2013). This evaluation is guided by the legislative directive that "evidence having

any tendency in reason to prove any material fact" is relevant. K.S.A. 60-401(b).

The definition of relevancy includes both a materiality element and a probative element. Evidence is material when the fact it supports is in dispute or in issue in the case and is probative when it has a logical tendency to prove a material fact. *State v. Prine*, 297 Kan. 460, 477, 303 P.3d 662 (2013); *State v. Reid*, 286 Kan. 494, 504-06, 186 P.3d 713 (2008); *State v. Garcia*, 285 Kan. 1, 14, 169 P.3d 1069 (2007). Different standards of review apply when an appellate court examines the trial judge's evaluation of each of those elements. The determination of materiality is reviewed de novo, and the assessment of probative value is reviewed under an abuse of discretion standard. *Reid*, 286 Kan. at 508-09.

In this case, a highly disputed issue was whether Lowrance intended to have sexual intercourse with Dennis while she was so intoxicated she could not legally consent—*i.e.*, whether he intended to rape her. See K.S.A. 21-3502(a)(1)(C) ("Rape is: [1] Sexual intercourse with a person who does not consent to the sexual intercourse, under any of the following circumstances: . . . [C] . . . when the victim is incapable of giving consent because of the effect of any alcoholic liquor, narcotic, drug or other substance, which condition was known by the offender or was reasonably apparent to the offender."). Miller's testimony was logically connected to the State's theory that Lowrance had the intent to commit rape. As the trial judge noted, there was a striking similarity between the incidents when Lowrance and Miller would drive to the river and have sex in Lowrance's car and the State's theory that Dennis' state of undress and the presence of her DNA on the passenger seat of Lowrance's car suggested that there was an attempt to have sexual intercourse in his car after they left the party. Our de novo assessment of the materiality of the evidence is in accord with the trial judge's, and we conclude the trial judge did not abuse his discretion when he determined the evidence was probative because it had a logical tendency to prove a material fact.

B. *Admissibility Under K.S.A. 60-447*

Lowrance's next argument raises the question of whether the evidence was inadmissible, even if relevant, under K.S.A. 60-447. K.S.A. 60-447 provides, in part, that "when a trait of a person's character is relevant as tending to prove conduct on a specified occasion," the evidence may be admitted by the prosecution in a criminal case "only after the accused has introduced evidence of his or her good character." Lowrance argues he "did not put his character into evidence, therefore the state was not permitted to offer evidence of [his] character traits, like promiscuity and a will-ingness to engage in casual sex." The State responds by arguing the evidence was not character evidence because "consensual sex between adults is not a bad character trait."

Our review of the record reveals no basis for the jury to draw inferences regarding Lowrance's sexual promiscuity or whether his relationship with Miller was casual. Miller's testimony consisted of answers to just a handful of questions. She indicated she had a relationship with Lowrance in 2004; it was of a sexual nature; they would have sex in places other than their homes, including his car; they would drive to a location on River Road; she would remove her clothing from the lower part of her body; and they would have sex in the front passenger seat. Although Lowrance's wife had told the jury she married Lowrance on December 31, 2004, the jury had no information with which to calculate how soon the marriage followed Lowrance's 2004 relationship with Miller—that is, whether the marriage and relationship were separated by almost 12 months or some shorter period of time. Nor was there any information about the duration or seriousness of the relationship between Lowrance and Miller. In summary, Lowrance's argument rests on information the jury was not provided, largely because of the State's pretrial agreement to limit the evidence.

Furthermore, nothing about Miller's testimony relayed a particular character trait. "The type of character traits contemplated by K.S.A. 60-447 are 'traits such as violent, gentle, trusting, or angry.'" *Pabst*, 268 Kan. at 516 (quoting *State v. Gaines*, 260 Kan. 752, 765, 926 P.2d 641 [1996]). Rather, the evidence demonstrated a pattern of

behavior or, as the State argues, a modus operandi. The decisions in *Pabst* and *Gaines* illustrate the distinction.

In *Pabst*, this court considered whether K.S.A. 60-447 applied to evidence that the defendant had been involved in a prior incident that had some factual similarity to the incident for which the defendant was on trial, including the use of the same gun. We held the prior incident did not show a character trait, the evidence was " 'simply a fact.' " *Pabst*, 268 Kan. at 515-16.

Similarly, the evidence in *Gaines* related to a prior incident that shared some factual similarity to the crime at issue. The sexual assault victim in that case reported that the perpetrator twice grabbed her foot and sucked on her big toe. The State sought to introduce testimony of Gaines' ex-wife that he sucked on her big toe occasionally while they were engaged in sexual conduct. The defendant claimed the ex-wife's testimony was inadmissible character evidence. These arguments were rejected by this court, which held that K.S.A. 60-447 did not apply because toe sucking is not a type of a character trait contemplated by the statute. *Gaines*, 260 Kan. at 765.

Similarly, the objected-to evidence in this case—consensual sex between adults—is not evidence of a character trait. Rather, the evidence illustrated a particular pattern of behavior, comparable to toe sucking, from which reasonable inferences could be drawn when considered along with the physical evidence in this case. Accordingly, K.S.A. 60-447 did not apply, and the trial judge did not error in allowing the State to introduce the evidence.

### C. *Probative Value Versus Prejudicial Impact*

Finally, under K.S.A. 60-445 an analysis may be required depending on the issue and the parties' arguments. Under this court's caselaw applying that statute, a trial judge " 'may in his or her discretion exclude evidence if he or she finds that its probative value is substantially outweighed by' " its prejudicial impact. *Shadden*, 290 Kan. at 817-18; see *Reid*, 286 Kan. at 509, 512. On appeal, this determination is reviewed under an abuse of discretion standard, and the burden of proof is on the party alleging that the discretion was abused. *Garcia*, 285 Kan. at 18-19.

Lowrance contends that Miller's testimony was unduly prejudicial. To support his argument he cites *State v. Blomquist*, 39 Kan. App. 2d 101, 111, 178 P.3d 42 (2008), in which the Court of Appeals concluded that a prosecutor's references to homosexual orientation and sexual desires for children was prejudicial. In addition, he asserts that in a small community like Coffeyville the jurors were likely to hold conservative beliefs about premarital sexual relationships.

*Blomquist* is distinguishable because the evidence in this case related to consensual sex between adults, not sexual desires toward children—a behavior broadly condemned in society. Attitudes regarding consensual sex between unmarried adults are not as clearly defined, and a trial judge is in the best position to evaluate how jurors in his or her community will view the evidence. Hence, it would be inappropriate for us to disturb the trial judge's weighing absent a clear abuse of discretion, which we cannot find in this case because other reasonable people could agree with the trial judge's assessment.

We hold that the trial judge's decision to allow the State to introduce the evidence was not an abuse of discretion.

## ISSUE 4: NO ERROR IN ADMITTING OPINION EVIDENCE

Next, Lowrance contends the trial judge committed reversible error in allowing Aduddell to express an opinion as to Lowrance's intent by stating that Lowrance was "trying to get some." Lowrance argues this testimony was inadmissible opinion testimony that had no bearing on the jury's understanding of Aduddell's testimony.

Before trial, Lowrance sought to exclude the evidence by filing a motion in limine. The judge denied the motion, stating that Aduddell could testify as to his opinions or his perceptions pursuant to K.S.A. 60-456. At trial, when the prosecutor asked Aduddell what his thought was at the time Lowrance left the party with Dennis, Aduddell began his answer by stating, "My honest opinion was I thought . . . ." Defense counsel objected and before the trial judge could rule, Aduddell completed his answer by saying, "he was trying to get some." The trial judge called counsel to the bench, at which time defense counsel indicated the answer was "specu-

lation"; counsel also renewed the objections made in the motion in limine. The trial judge allowed the answer to stand, and Aduddell was asked to explain what he meant.

Before us, Lowrance does not dispute the relevance of Aduddell's opinion. Indeed, any evidence that sheds light on the actions or behavior displayed by Lowrance on the night of the incident is relevant to the issue of intent. See, *e.g.*, *State v. Perez*, 26 Kan. App. 2d 777, 782, 995 P.2d 372 (1999) (evidence of victim's sexual behavior hours before the alleged rape was relevant to issues of credibility and consent), *rev. denied* 269 Kan. 93 (2000).

Rather, Lowrance's focus on appeal relates to whether K.S.A. 60-456 prohibits admission of the evidence. K.S.A. 60-456 generally governs the admissibility of all opinion testimony, regardless of the subject or the classification of the witness as lay or expert. See *Shadden*, 290 Kan. at 818. Under K.S.A. 60-456(a), a lay witness is allowed to offer opinions or inferences "as the judge finds (a) may be rationally based on the perception of the witness and (b) are helpful to a clearer understanding of his testimony." See *Shadden*, 290 Kan. at 818. The statute also provides that "[t]estimony in the form of opinions or inferences otherwise admissible under this article is not objectionable because it embraces the ultimate issue or issues to be decided by the trier of fact." K.S.A. 60-456(d).

In reviewing a claim of error under the statute, we recognize that a trial judge has broad discretion in determining whether a witness may testify in the form of an opinion. See *State v. Hunt*, 285 Kan. 855, 865-66, 176 P.3d 183 (2008); *State v. Wade*, 244 Kan. 136, 145, 766 P.2d 811 (1989); *State v. Richard*, 235 Kan. 355, 361, 681 P.2d 612 (1984); *Osborn v. Lesser*, 201 Kan. 45, Syl. ¶ 2, 439 P.2d 395 (1968), *overruled on other grounds State v. McCullough*, 293 Kan. 970, 270 P.3d 1142 (2012). Consequently, an appellate court reviews a trial judge's ruling on the admissibility of opinion testimony under an abuse of discretion standard. *Shadden*, 290 Kan. at 819.

"Judicial discretion is abused if judicial action (1) is arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, *i.e.*, if substantial

competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based." *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

Here, Lowrance does not suggest the trial judge made an error of law by allowing Aduddell to express his opinion; in other words, he does not suggest that lay opinion testimony as to another's state of mind is categorically prohibited by K.S.A. 60-456. This may be because "courts have been very liberal in admitting witnesses' testimony as to another's state of mind if the witness[es] ha[ve] had sufficient opportunity to observe the accused so as to draw a rational conclusion." *United States v. Hoffner*, 777 F.2d 1423, 1425 (10th Cir. 1985). In applying the federal counterpart to K.S.A. 60-456, federal courts generally recognize that the current rules of evidence are " 'a sharp departure in theory, if not in practice, from the common law' " and that under the rules "there is no theoretical prohibition against allowing lay witnesses to give their opinions as to the mental states of others." *United States v. Rea*, 958 F.2d 1206, 1214-15 (2d Cir. 1992) (citing 2 Saltzburg & Martin, Federal Rules of Evidence Manual 1 [5th ed. 1990]); 3 Weinstein & Berger, Weinstein's Evidence ¶ 701 [02], pp. 701-19 to 701-21 [1991]; and see *United States v. Goodman*, 633 F.3d 963, 968 (10th Cir. 2011) (holding that trial judge abused discretion in entering order prohibiting lay witnesses from expressing opinion about defendant's state of mind).

Nevertheless, as these courts recognize, it may be error to admit a lay witness' opinion testimony if the opinion (a) is not rationally based on the perception of the witness, *i.e.*, is unduly speculative, and (b) is not helpful to a clearer understanding of the witness' testimony. Here, as to the first prong, while Lowrance repeatedly refers to Aduddell's testimony as speculative, he does not develop the argument or explain why the opinion was not rationally based on Aduddell's perceptions. See *McCain Foods USA, Inc. v. Central Processors, Inc.*, 275 Kan. 1, 15, 61 P.3d 68 (2002) (" 'Where the appellant fails to brief an issue, that issue is waived or abandoned.' "). And Aduddell's testimony makes it clear his opinion was based on his observations of Lowrance's actions and his knowledge of Lowrance's behavior.

Instead, Lowrance focuses on the second prong and argues that Aduddell's opinion was not helpful to the jury. He suggests the jury could have understood Aduddell's testimony without his opinion. Contrary to this argument, a person's demeanor can be difficult to describe without opinion testimony, *i.e.*, the witness' belief, thought, or conclusion based upon his or her observations and perceptions. Aduddell's knowledge of Lowrance gave him insight into what was motivating that behavior and his opinion helped to convey Lowrance's demeanor and state of mind to the jury. This situation is somewhat like a witness' opinion testimony that a driver is intoxicated. The witness can describe the driver's behavior to the jury by, for example, relating having seen the person stumble or having heard the driver's slurred speech. From that testimony, a jury might reach the conclusion that the driver was intoxicated. But we do not foreclose a trial judge's decision to allow the witness to express a personal opinion, drawn from those observations, that the driver was intoxicated because that opinion assists the jury in understanding the testimony. See *Shadden*, 290 Kan. at 819-20; *State v. Kendall*, 274 Kan. 1003, 1013, 58 P.3d 660 (2002); *State v. Townsend*, 146 Kan. 982, 986, 73 P.2d 982 (1937). Likewise, in this case, the jurors could have reached their own opinions regarding Lowrance's intentions, and they may have reached the same opinion as did Aduddell once they knew that Lowrance left the party to get his car for the apparent purpose of driving Dennis home, which he insisted on doing even though it was not necessary.

A reasonable person could agree with the trial judge in this case that Aduddell's opinion, which was based on his observations and knowledge of Lowrance, assisted the jury in understanding the evidence. While others might disagree with the trial judge, if reasonable persons could agree it cannot be said that the trial judge abused his discretion. See *State v. Phillips*, 295 Kan. 929, 949, 287 P.3d 245 (2012); *State v. Reyna*, 290 Kan. 666, 688, 234 P.3d 761, *cert. denied* 131 S. Ct. 532 (2010).

Consequently, we reject Lowrance's argument that the trial judge erred in allowing Aduddell to express his opinion.

## Issue 5: The Evidence Was Sufficient

Next, Lowrance asserts there was insufficient evidence to support his capital murder conviction. To prove the elements of capital murder, the State had to prove beyond a reasonable doubt that Lowrance intentionally, and with premeditation, killed Dennis in the commission of, or subsequent to, the crime of attempted rape. See K.S.A. 21-3439(a)(4). Lowrance argues there is no evidence he committed an overt act toward the commission of rape and, therefore, the State failed to meet its burden of establishing the offense of the capital murder charge. See K.S.A. 21-3301(a) (Attempt is "any overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof or is prevented or intercepted in executing such crime.").

This court's standard of review is well known: "When examining the sufficiency of the evidence in a criminal case, the standard of review is whether, after reviewing all the evidence in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *Ward*, 292 Kan. at 581. An appellate court does not reweigh the evidence, assess the credibility of the witnesses, or resolve conflicting evidence. *Ward*, 292 Kan. at 581.

In making his argument, Lowrance notes that there was no physical evidence of sexual trauma to Dennis or DNA evidence derived from Lowrance's body fluids. In making this argument, Lowrance seems to infer two things: First, there must be evidence of an attempt at penetration before the crime of attempted rape can be proved and, second, there must be direct evidence of the crime. Neither suggestion is correct.

Regarding the first point, this court has repeatedly held that " '[a] charge of attempted rape may be established without evidence of attempted penetration.' " *State v. Gonzales*, 245 Kan. 691, 698, 783 P.2d 1239 (1989) (quoting *State v. Hanks*, 239 Kan. 524, 529, 694 P.2d 407 [1985]); see, *e.g.*, *State v. Martinez*, 290 Kan. 992, 1006-07, 236 P.3d 481 (2010) (sufficient evidence of attempted rape even though evidence established only a touching of

victim's "bottom"); *State v. Peterman*, 280 Kan. 56, 60-61, 118 P.3d 1267 (2005) (sufficient evidence of attempted rape even though defendant never came into close proximity with his intended victim); *State v. Zimmerman*, 251 Kan. 54, 60-61, 833 P.2d 925 (1992) (sufficient evidence of attempted rape where victim's shorts were pulled down). Thus, the lack of physical evidence establishing trauma to Dennis' genital area does not necessarily mean the evidence was insufficient to prove the offense of attempted rape.

As to the second point, it is well established that a conviction for even the gravest offense may be sustained by circumstantial evidence. *State v. Becker*, 290 Kan. 842, 852, 235 P.3d 424 (2010). But, as Lowrance also argues, " ' "the circumstances in question must themselves be proved and cannot be inferred or presumed from other circumstances." ' " *State v. Richardson*, 289 Kan. 118, 127, 209 P.3d 696 (2009) (quoting *State v. Williams*, 229 Kan. 646, 648-49, 630 P.2d 694 [1981]).

In suggesting the jury had to stack inferences in order to convict him of capital murder in the commission of, or subsequent to, the crime of attempted rape, Lowrance asserts the lone fact Dennis was found unclothed from the waist down did not allow an inference that Lowrance was involved in the removal of the clothing for the purpose of sexual activity or that he did so without Dennis' consent. The fallacy of Lowrance's argument is that the jury did not have to infer that it was Lowrance who removed the clothes in order for the jury to find that he committed attempted rape.

Overt acts toward the commission of the crime of rape were established by direct evidence that Lowrance retrieved his car, virtually carried Dennis to the passenger seat, and drove her where the two could be alone. This was evidence from which intent could be inferred—as Aduddell stated, that Lowrance was planning "to get some"—and evidence of overt acts in furtherance of that intent. See *Peterman*, 280 Kan. at 64 (defendant's act of driving to meet someone to pick up a child he intended to have sexual intercourse with constituted an overt act). While intent had to be inferred, the act did not. Such actions—escorting someone home or preparing for sexual acts—will not always lead to attempted rape. What sets this case apart is the apparent inability of Dennis to consent. As in

*Peterman* where the driver went to pick up a child who was incapable of legal consent, here there was forensic evidence, specifically blood test results, establishing that Dennis was incapable of legally consenting. See K.S.A. 21-3502(a)(1)(C). Her apparent drunkenness also made this obvious. Yet, despite Dennis' apparent inability to consent, Lowrance took steps toward the commission of an act that is statutorily defined as a crime.

Dennis' lack of clothing and Lowrance's pattern of conduct with Miller provide additional circumstantial evidence that strengthened the inference that Lowrance intended to have sex with Dennis and that Lowrance had taken steps toward acting on that intent. Nevertheless, simply because various circumstances independently lead to the same inference does not mean inferences have been stacked.

Further, the possibility that Dennis may have voluntarily removed her clothing herself does not vitiate the inference. There was direct evidence that Dennis was legally intoxicated and thus legally incapable of consenting. See K.S.A. 21-3502(a)(1)(C). Thus, contrary to Lowrance's argument, even assuming Dennis' partial nakedness resulted from her own actions, the jury could have determined that an overt act toward the commission of rape—a voluntary sexual act by one incapable of legal consent—had occurred.

Reviewing all the evidence in the light most favorable to the State, we conclude that a rational factfinder could have found Lowrance guilty beyond a reasonable doubt of attempted rape and the capital murder based on that attempt, even though there was no evidence of sexual trauma. Sufficient evidence exists to support Lowrance's conviction of capital murder.

### ISSUE 6: NO CUMULATIVE ERROR

Lowrance contends that even if no single error was sufficient to require reversal of his conviction, the cumulative effect of multiple errors nevertheless deprived him of a fair trial. Because we have not found any errors, there are no errors to accumulate and the cumulative error doctrine is not applicable. *State v. Ellmaker*, 289 Kan. 1132, 1157, 221 P.3d 1105 (2009), *cert. denied* 130 S. Ct. 3410 (2010).

Affirmed.