IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 106,317

STATE OF KANSAS,
*Appellee*,

v.

ROGER WILLIAM HOLLISTER,
*Appellant*.

SYLLABUS BY THE COURT

1.

The general rule that the death of a criminal defendant does not abate the defendant's direct appeal from his or her criminal convictions does not require an appellate court to consider the merits of each issue raised by the deceased defendant's appeal. Instead, an appellate court should consider whether an issue: (1) is of statewide interest and of the nature that public policy demands a decision, such as those issues that would exonerate the defendant; (2) remains a real controversy; or (3) is capable of repetition. Only issues meeting one of these criteria should be addressed.

2.

After reviewing all the evidence in this case in the light most favorable to the prosecution, we are convinced the evidence is sufficient for a rational factfinder to find the defendant guilty beyond a reasonable doubt.

Appeal from Atchison District Court; MARTIN J. ASHER, judge. Opinion filed August 1, 2014. Affirmed in part and dismissed in part.

*Sarah Ellen Johnson*, of Capital Appellate Defender Office, argued the cause and was on the brief for appellant.

*Gerald R. Kuckelman*, county attorney, argued the cause, and *Derek Schmidt*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

*Per Curiam*:  Roger W. Hollister was convicted by a jury of capital murder under K.S.A. 21-3439(a)(2) for the intentional and premeditated killing of Patricia Kimmi, pursuant to a contract or agreement to kill her. Hollister filed this direct appeal, but he passed away before oral arguments were conducted. His death raises the question of whether his appeal is moot.

In Kansas, the death of a criminal defendant does not automatically abate a defendant's appeal. We hold, however, that this nonabatement rule does not require us to consider all issues in an appeal. Rather, an appellate court should consider whether an issue:  (1) is of statewide interest and of the nature that public policy demands a decision, such as those issues that would exonerate the defendant; (2) remains a real controversy; or (3) is capable of repetition. Only issues meeting one of these criteria should be addressed.

In this case, the only issue that meets these criteria is an issue that might clear Hollister's name, specifically his claim that the evidence was insufficient to support his conviction. Finding no merit to that issue, we affirm Hollister's conviction. Further, because we conclude the remaining issues are moot, we dismiss the remainder of this appeal.

FACTS AND PROCEDURAL BACKGROUND

Patricia and Eugene Kimmi had been married for 37 years when they divorced in March 2008. When the acrimonious divorce proceedings concluded, Eugene frequently complained to numerous individuals about the division of marital property and his ongoing maintenance obligations. Several people heard him say that he wanted Patricia dead. For example, Eugene's nephew, D.J. Kimmi, who had worked at the Kimmi sawmill with Eugene for 25 years, testified he heard Eugene make such a statement at least once a week after the divorce.

On Saturday, November 7, 2009, Patricia's best friend and her children became concerned because Patricia had not answered either her cell phone or house phone and had not returned their calls since the prior day. Because this was unusual, two of Patricia's and Eugene's four children went to their mother's house on 326th Road in Atchison County to check on her. When they arrived, they found her vehicle outside her house and her keys, cell phone, and purse inside. Several items were out of place or knocked over. When they could not locate their mother, they called law enforcement officers who began a search. The officers noticed carpet threads on the deadbolt lock and "drops of blood . . . spattered about a two foot by two foot area" of the gravel driveway.

As the search expanded, several pieces of evidence were located along 326th Road in an area not far from Patricia's house. This area became known as the "second scene." The items found at the second scene included a camouflage ball cap embroidered with Saylor Insurance Service, Inc.; a bloody money clip; a bloody cologne bottle and detached cap; a bloody velvet brown bag that had another bag inside it with eight .22 Magnum live rounds and some .22 Magnum shells; and a bloody latex glove. Law enforcement officers also observed an area of blood-stained grass. Months later, it was determined that a DNA profile from the ball cap was consistent with the profile of

3

Hollister and the blood on the money clip, plastic cologne cap, cologne bottle, velvet bag, latex glove, and grass was consistent with the DNA of Patricia. Other evidence established that Hollister used the brand of cologne found at the second scene and that he often kept a bottle in his pickup truck. Eventually, after months of denying any involvement in Patricia's disappearance, Hollister admitted the money clip was his.

About a mile away from the second scene, searchers found a Walmart receipt dated November 6, 2009, which was the first day Patricia had not answered her friend's and family's telephone calls. Officers were able to track the customer through the receipt and question him. The customer told officers he and a friend had been drinking alongside 326th Road on that night. As they left, he drove down 326th Road and along the way saw a red Dodge dually pickup truck beside the road. He could see legs kicking in the air behind the truck in the grass. The legs appeared to have on green pants and cowboy boots.

Law enforcement issued a release to the public that included pictures of the Saylor Insurance ball cap, the money clip, and a description of the red dually pickup truck. This led to an anonymous tip that Hollister owned all of the items described in the release. Investigators then verified that Hollister was a customer of Saylor Insurance and had insured a pickup truck through the agency.

Slightly over 1 month after Patricia's disappearance, Atchison County Undersheriff Larry Myer interviewed Hollister at his farm. Hollister admitted he knew Eugene and did business at Kimmi's sawmill, but he denied ever meeting Patricia. Hollister also admitted that he had owned a red dually pickup truck, but he explained he had sold it to an individual for $2,000. When asked if he owned any Saylor Insurance ball caps, he told Myer he had several because he was friends with the owner.

4

Contrary to Hollister's statement about selling his pickup truck, law enforcement officers learned that he had sold his truck a few days after Patricia's disappearance to the Brinkman Brothers Chevy dealership in Tecumseh, Nebraska. The dealership accepted Hollister's 1998 red Dodge crew cab dually pickup truck, which was described as "extremely clean," as a trade-in when Hollister purchased a 2000 Chevy truck. The day after the sale, Hollister called the dealership and asked if there was a money clip in his old pickup truck; there was not. A week later, Hollister called and asked if the dealership still had his old pickup truck because he wanted to purchase it back. The truck had not been sold, and Hollister purchased it.

Myer interviewed Hollister again several times. During one interview, Myer told Hollister that investigators knew he had sold his pickup truck to the Brinkman Brothers dealership. Hollister responded by saying that he bought the truck back from the dealership for $5,400 and then sold it for $6,500, and made $1,100 profit. When questioned again about the Saylor Insurance ball cap, Hollister said his dog got a hold of it and "'it's laying [*sic*] in the yard, part of it's still there, the dog chewed it up.'" Hollister also showed officers a money clip that was similar to but not identical to the one found at the second scene.

In addition, investigating officers checked into Hollister's business at Kimmi's sawmill. D.J. remembered Hollister and specifically recalled one occasion in September 2009 when Hollister and Eugene sat in the office talking and drinking for about 45 minutes. Once Eugene started telling Hollister about the divorce, D.J. left the office. D.J. also recalled Hollister calling the sawmill about 2 months after Patricia disappeared. D.J. did not hear the conversation, however, because Eugene moved outside before talking to Hollister.

A week after the telephone call, Hollister was at the sawmill when D.J. arrived for work. After learning Eugene was not there, Hollister told D.J. he had been questioned by

5

law enforcement and had given them a DNA sample. After D.J. told Hollister that law enforcement had taken Eugene's DNA as well, Hollister said, "I told Eugene to watch what he wished for, that I would take care of his problem for him." D.J. asked Hollister what he meant and Hollister replied, "I know this hit man that comes through the country and he called me awhile back and told me that he was coming through and he would take care of this problem for me." Hollister asked D.J. if Eugene was still paying Patricia alimony, and D.J. indicated he was. Hollister told D.J., she "will never be found. . . . [S]he's not here to take him back to court, so he doesn't need to keep paying her."

Hollister then talked about the money Eugene owed him, saying, "When he came through, it cost me $70,000.00. . . . [I]t wiped me out, it took all my money. . . . I'm here to recoup my money." Hollister also wanted "$10,000.00 to pay for his pickup that he had to have crushed because it matched the description of the pickup that they were looking for and he couldn't take any chances." D.J. told Hollister that Eugene did not have that kind of money and his bank accounts were being monitored, but Hollister replied that Eugene had told him that he had some money stashed. Hollister told D.J. to tell Eugene that he was looking for him, he needed his money, and if anyone asked about his visit to the sawmill to tell them that he was there to get some oak lumber.

Later, when Myer asked Hollister about this conversation, Hollister indicated the "younger man" at the sawmill brought up the investigation and a $70,000 payment. Hollister denied talking about a hit man.

Law enforcement officers looking for Hollister's red dually pickup truck learned that Hollister had recently done business with Smitty's Salvage Yard in Axtell. An officer explained to the salvage yard's owner that investigators were looking for a red pickup truck. The owner showed the officer a crushed and burnt cab of a four-door pickup truck that had been anonymously left on what appeared to be a homemade grain cart; red paint

could still be seen around the edges of the cab. Investigators were able to identify the vehicle identification number on one portion and a derivative number on another portion. These numbers matched the vehicle identification number on the title of a Dodge pickup truck belonging to Hollister.

Based on the information gathered through the investigation, law enforcement officers obtained and executed a search warrant at Hollister's property. The executing officers found a burn pit in which they located a muffler and other vehicle parts. Nearby, they found backhoe tracks in the snow, leading them to dig in a ditch where they found a buried partial bed of a pickup truck that had been burnt and smashed.

After the search, Hollister and his attorney contacted Myer and offered to make yet another statement. Hollister began the recorded interview by saying he had previously tried to hide what had happened because he was scared for his life and his daughter's life. He then told officers that on the Friday night Patricia disappeared, Eugene knocked on Hollister's door and asked to borrow Hollister's dually pickup truck. Although Hollister did not know Eugene very well, they had done business together and Hollister trusted him; consequently, he allowed Eugene to take the pickup truck. When Hollister woke up Saturday morning, the pickup truck had been returned; it was extremely clean and had a full tank of gas. A few days later, Hollister traded in the pickup truck for another at the dealership in Nebraska.

A few days after he traded in the pickup truck, Hollister and his wife were parked outside the John Deere dealership in Hiawatha when Eugene pulled up beside him. Eugene asked where Hollister's red dually pickup truck was. When Hollister told him, Eugene became very angry and told Hollister that if he cared for his life and his family's lives he would get the pickup truck back. Eugene said he would pay $10,000 for the truck and another $70,000 to keep Hollister's mouth shut. Hollister told Eugene he did not want the money.

Nevertheless, Hollister got the pickup truck back, destroyed it, and took it out to Smitty's Salvage Yard. Repeatedly during the interview, Hollister indicated he was afraid and adamantly denied going with Eugene or having anything to do with Patricia's disappearance.

Hollister was taken into custody on other charges on March 4, 2010. The next day, Hollister and his attorney contacted Myer and offered to give another statement. In this recorded statement, Hollister admitted to going to Patricia's house with Eugene. Hollister indicated that in the September 2009, conversation at the sawmill, Eugene had said, "If I could just find someone to take care of my wife for $70,000." Hollister denied saying anything in reply.

Then, on Friday, November 6, 2009, Eugene knocked on Hollister's door asking to borrow his dually pickup truck. Because Hollister would not let anyone borrow his truck, he told Eugene he would drive. Eugene directed him to a house and told him to wait in the pickup truck. Hollister saw Eugene drag a rolled-up carpet out of the house and put it in the back of the truck. Eugene then instructed Hollister to drive west. A short distance down the road, it sounded like something fell out of the back of the truck. Eugene told Hollister to stop and to keep watch. While Hollister stood by the truck, another vehicle drove by.

Eugene then pushed the roll of carpet back into the pickup truck and asked Hollister for some pliers because he wanted to secure the load with some wire. In the process, Eugene knocked over a box on the floorboard that contained Hollister's money clip. Once the truck was reloaded, Eugene instructed Hollister to drive to Hollister's house. When they arrived, Eugene slid the cargo out of Hollister's truck and into Eugene's truck. Hollister then went inside.

8

Approximately 2 months later, Rebecca Hollister and her attorney contacted law enforcement and reported that Rebecca had discovered potential evidence. The next day, Rebecca directed law enforcement officers to a location near the creek on adjoining property that belonged to Hollister's brother but was managed by Hollister. Rebecca showed the officers a piece of green fabric and some human remains. A forensic pathologist examined the vertebral body and the few ribs that were still attached and noticed a line of destruction where the ribs appeared to have been cut in a straight line. There was no way to determine whether the destruction to the bones was antemortem or postmortem. Nor could the pathologist determine the cause of death from the remains, but he did determine the death was a homicide. A reverse maternity test determined there was a "99.99 percent" chance the bones were from Patricia Kimmi, mother of the Kimmi children.

A jury hearing this evidence convicted Hollister of capital murder under K.S.A. 21-3439(a)(2) for the intentional and premeditated killing of Patricia, pursuant to a contract or agreement to kill. The sentencing court imposed a life sentence without the possibility of parole. Hollister timely appealed his convictions.

EFFECT OF HOLLISTER'S DEATH

At oral argument in this appeal, both counsel acknowledged that Hollister had passed away after this appeal had been filed. This led to questioning by the court about the status of the appeal and a subsequent motion by Hollister's appellate counsel in which she argued that a criminal defendant's direct appeal is not abated by death. See, *e.g.*, *State v. Salts*, 288 Kan. 263, 265, 200 P.3d 464 (2009) (defendant's death 12 days after his notice of appeal was filed did not render his direct appeal moot); *State v. Burnison*, 247 Kan. 19, 32, 795 P.2d 32 (1990) ("[I]n Kansas the death of a defendant does not abate his direct appeal as it is in the interest of the public that the issues raised on appeal be adjudicated upon the merits."); *State v. Jones*, 220 Kan. 136, Syl. ¶ 1, 551 P.2d 801

(1976) ("Death of an appellant during the pendency of his direct appeal from the conviction of a criminal offense does not abate the appeal."); *State v. Ellvin*, 51 Kan. 784, Syl. ¶ 1, 33 P. 547 (1893) (court reviewed judgment for costs related to late defendant's conviction for selling intoxicating liquors); *State v. Fisher*, 37 Kan. 404, 405, 15 P. 606 (1887) (considered merits of case after defendant's death to resolve issue of costs).

By not abating an appeal on a criminal defendant's death, Kansas stands apart from many other jurisdictions. The most common approach—one that has been adopted by the federal courts and more state appellate courts than any other approach—is to apply the doctrine of abatement *ab initio*. Under this doctrine, a criminal defendant's death abates the appeal and all proceedings from the beginning of the criminal case. Courts adopting this approach often reason that the purpose of a criminal proceeding is punishment, and the death divests a court of jurisdiction to either enforce a judgment or, if a conviction is reversed, to conduct a new trial. In another approach, several state courts have held that the death renders the appeal moot; in these cases, the appeal is dismissed, and the conviction stands. See *State v. Burrell*, 837 N.W.2d 459, 462-67 (Minn. 2013) (discussing various approaches and listing cases using each approach).

Kansas and a few other states follow a third approach that allows an appellate court to consider the merits of the appeal. In *Jones*, this court explained the reasons it was adopting this approach. First, the court noted the "state and the defendant (not to mention his family) have endured the strain, the tribulation and the expense of trial and appeal" and have an interest in the final determination of a criminal case. 220 Kan. at 137. Additionally, a "right to inherit, or to take by will or otherwise, may be affected." 220 Kan. at 137. Given these considerations, the court concluded that "under the circumstances of this appeal," the "proceeding should be adjudicated upon the merits." 220 Kan. at 137; see *Burnison*, 247 Kan. at 32 (stating, "it is in the interest of the public that the issues raised on appeal be adjudicated upon the merits").

10

More recently, this court subtly indicated not all issues will be reviewed, stating: "The issues *may* be fully reviewed and adjudicated when doing so is in the public interest or when it is in the interest of the appellant's family and estate." (Emphasis added.) *State v. Karson*, 297 Kan. 634, Syl. ¶ 1, 304 P.3d 317 (2013). In *Karson*, the court held the defendant's death did not abate his appeal "in light of the public interest considerations attendant to the case." 297 Kan. at 638. Specifically, the court noted the issue touched on the constitutionality of a statute, raised an issue common in several other appeals but under "somewhat different" facts, and involved the review of a published Court of Appeals decision. 297 Kan. at 637-38; see *State v. Hand*, 297 Kan. 734, 736, 304 P.3d 1234 (2013) (despite defendant's death, court considered merits of petition for review concerning the sentencing judge's reliance on fair market value of property stolen because it was in public interest).

Both *Karson* and *Hand* reached this court on petitions for review, which means this court's review was entirely discretionary. See K.S.A. 20-3018(b); K.S.A. 60-2101(b); Supreme Court Rule 8.03 (2013 Kan. Ct. R. Annot. 74). While this discretion might explain the use of "may" in *Karson*, the context clarifies that the statement applies to any criminal defendant's direct appeal where the defendant has died. *Karson* instructs us that the general nonabatement rule—*i.e.*, that the death of a criminal defendant does not abate the defendant's direct appeal from his or her criminal convictions—does not require an appellate court to consider the merits of every issue raised in the deceased defendant's appeal.

The approach taken in these cases is consistent with this court's broader approach to addressing moot issues in other contexts. We have explained that the "'mootness doctrine is one of court policy.'" *Smith v. Martens*, 279 Kan. 242, 244, 106 P.3d 28 (2005) (quoting *Board of Johnson County Comm'rs v. Duffy*, 259 Kan. 500, Syl. ¶ 1, 912 P.2d 716 [1996]). In exercising this policy, "'[a]n appellate court may sometimes elect to entertain issues which, although moot, are subjects of real controversy and include issues

11

of statewide interest and importance' or 'is one capable of repetition.'" *Martens*, 279 Kan. at 244 (quoting *Duffy*, 259 Kan. 500, Syl. ¶ 2).

In light of this caselaw, we hold that an appellate court should consider whether an issue: (1) is of statewide interest and of the nature that public policy demands a decision, such as those issues that would exonerate the defendant; (2) remains a real controversy; or (3) is capable of repetition. Only issues meeting one of these criteria should be addressed.

In this case, as the factors discussed in our past cases were explored during oral arguments, the parties seemed to agree that the only issue that would clear Hollister's name is an insufficiency of evidence issue; all other issues would require a remand for a new trial if error was found, but a new trial would be impossible given Hollister's death. Further, the State advised it did not believe there were any issues of statewide interest alleged in the case. We agree.

Hollister's counsel attacks Hollister's convictions, raising four issues in addition to the sufficiency of the evidence: (1) The trial court committed reversible error in failing to instruct the jury on the lesser included offense of second-degree intentional murder; (2) the trial court committed reversible error in modifying the element instruction on capital murder to include aiding and abetting liability which eliminated an element of the offense; (3) the prosecutor committed reversible misconduct by telling the jury the State did not have to prove where the victim died; and (4) the cumulative effect of the errors deprived Hollister of a fair trial.

These four issues are unique to this case and are heavily fact dependent. As the State suggested, none of them would settle an issue of public policy given their case-specific nature. Accordingly, the issue that might exonerate Hollister—whether there was

sufficient evidence to sustain Hollister's conviction for capital murder—is the only issue we will consider.

## EVIDENCE WAS SUFFICIENT

An appellate court's standard of review on a sufficiency issue is well known: "When examining the sufficiency of the evidence in a criminal case, the standard of review is whether, after reviewing all the evidence in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Ward*, 292 Kan. 541, 581, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). An appellate court does not reweigh the evidence, assess the credibility of the witnesses, or resolve conflicting evidence. 292 Kan. at 581.

In this case, we must apply this standard to determine whether there was sufficient evidence of each of the elements of capital murder. As that offense was charged against Hollister, the State had to prove beyond a reasonable doubt that Hollister intentionally and with premeditation killed Patricia pursuant to a contract or agreement to kill her or that Hollister was a party to a contract or agreement pursuant to which Patricia was killed. See K.S.A. 21-3439(a)(2).

Hollister's counsel contends that so little is known about the circumstances surrounding Patricia's disappearance and death that no rational factfinder could find each of these elements had been proven beyond a reasonable doubt. Specifically, counsel attacks the evidence of a contract and of premeditation. In making the argument that there is insufficient evidence of a contract, counsel points out that it was well known that Eugene wanted Patricia dead but there was no evidence that Hollister agreed to help Eugene. In addition, Hollister's counsel argues there is no evidence of any payments. As to premeditation, counsel argues there is no evidence as to the weapon involved, no

13

evidence as to whether any blows were inflicted, and no evidence of statements or threats made by Hollister to Patricia.

*Contract for Hire*

The focus of Hollister's argument is on the lack of direct evidence of payments or, more generally, of an agreement. But evidence of a contract, like other elements, can be proven by circumstantial evidence. See *State v. Lowrance*, 298 Kan. 274, 297, 312 P.3d 328 (2013) ("[I]t is well established that a conviction for even the gravest offense may be sustained by circumstantial evidence."). The question, therefore, is whether there is evidence, including circumstantial evidence, to answer the determinative question of whether a binding contract was entered into, which "'depends upon the intention of the parties.'" *Price v. Grimes*, 234 Kan. 898, 904, 677 P.2d 969 (1984). We hold that there was sufficient circumstantial evidence of a contract to support the jury's verdict.

Specifically, Hollister admitted that Eugene had made an offer when Eugene said, "If I could just find someone to take care of my wife for $70,000." Other evidence indicates Hollister took Eugene up on this offer. D.J. testified that Eugene and Hollister had at least a 45-minute conversation in September and that Eugene talked about his divorce during the conversation. Then, after Patricia's disappearance, Hollister told D.J., "[W]ell I told Eugene to watch what he wished for, that I would take care of his problem for him." D.J. also reported that Hollister indicated he knew "this hit man that comes through the country and he called me awhile back and told me he was coming through and he would take care of this problem for me." The conversation moved from possibilities to action when Hollister told D.J. that when the man came through "it cost me $70,000. . . . [I]t wiped me out, it took all my money. . . . I'm here to recoup my money." Hollister then made a statement that indicated he had fulfilled his part of the contract by saying, "[T]he subject will never be found. . . . [S]he's not here to take him back to court, so he doesn't need to keep paying her." Finally, in demanding his payment,

14

Hollister would not accept D.J.'s statement that law enforcement had control of all of Eugene's money as an excuse for Eugene's failure to pay; according to Hollister, Eugene had said that he had some money stashed.

Hollister's counsel also argues that the State's case is insufficient because there is no evidence that money was ever exchanged. He suggests that the lack of consideration implies there was no agreement. But Hollister's actions speak loudly and communicate that he understood there to be an agreement. At most, therefore, the lack of payment indicates that Eugene breached his portion of the contract, not that there was no agreement. See *Cornett v. Roth*, 233 Kan. 936, 944, 666 P.2d 1182 (1983) ("'bilateral contract that has either been wholly performed on one side, or in which the promises are independent, a breach as to one or any number less than the whole of the promised acts is generally partial'") (quoting 5 Williston on Contracts, § 1290, p. 3676 [rev. ed 1937]).

This evidence, when viewed in the light most favorable to the State, was sufficient for a rational factfinder to determine Hollister had contracted with Eugene for the murder of Patricia.

*Premeditation*

Hollister similarly focuses on the lack of direct evidence of premeditation. As he argues, there is no direct evidence of this element, but premeditation, like other elements, can be proven by circumstantial evidence. To assist in the evaluation of the circumstances for proof of premeditation, this court has utilized several considerations:  (1) the nature of the weapon used; (2) the lack of provocation; (3) the defendant's conduct before and after the killing; (4) threats and declarations of the defendant before and during the occurrence; and (5) the dealing of lethal blows after the deceased was felled and rendered helpless. See *State v. Cosby*, 293 Kan. 121, 134, 262 P.3d 285 (2011); *State v. Scaife*, 286 Kan. 614, 617-18, 186 P.3d 755 (2008); *State v. Scott*, 271 Kan. 103, 109, 21 P.3d 516, *cert.*

15

*denied* 534 U.S. 1047 (2001). "Not all factors must be present before premeditation can be inferred." *State v. Marks*, 297 Kan. 131, 140, 298 P.3d 1102 (2013); *State v. Morton*, 277 Kan. 575, 581-83, 86 P.3d 535 (2004). "In some cases, one factor, standing alone, may be compelling evidence of premeditation." *State v. Cook*, 286 Kan. 1098, 1102-03, 191 P.3d 294 (2008) (stating, "This is from Tami in Wichita" before the shots were fired obviously manifested a premeditated intent to kill); *Morton*, 277 Kan. at 581-83 (evidence supporting second and third factors sufficient in finding premeditation).

Hollister correctly identifies those factors for which there is no evidence in this case: There is no evidence of the nature of the weapon used, any provocation, or any threats or even prior contact between Hollister and Patricia. Nevertheless, Hollister's conduct both before and after the killing and the evidence that lethal acts continued after Patricia had been rendered helpless are factors that weigh toward a finding of premeditation.

Most significant is the evidence we have already discussed that supports the conclusion Hollister entered into an oral contract with Eugene to either help arrange or participate in the killing of Patricia. In addition, Hollister admitted he was present when Patricia was kidnapped from her home. Physical evidence substantiates his presence, linking him to evidence found at the second scene through his DNA, his admission that some of the articles belonged to him, and the eyewitness' description of his red dually pickup truck. D.J.'s testimony provides evidence that Hollister knew Eugene wanted Patricia dead. Also, even if a juror believed that Eugene had just showed up on Hollister's doorstep and there had not been a prearranged plan, the State presented evidence describing the route Hollister would have driven from his house to Patricia's, a route that was described as at least a 10-minute drive. This evidence establishes that Hollister had an opportunity to consider his actions after Eugene allegedly showed up on Hollister's doorstep. The State also introduced evidence through D.J. establishing that Eugene was not a strong man; rather, D.J. performed the physical labor of operating the sawmill. This

16

testimony casts doubt on Hollister's statement that he just sat in his pickup truck while Eugene carried a rolled-up carpet out of Patricia's house, a task that common sense suggests could not be performed by someone who had difficulty performing heavy labor. And it was a reasonable inference that Patricia was in the carpet.

Furthermore, Hollister admits he went to great lengths to destroy his red dually pickup truck. And circumstantial evidence, such as the location where Patricia's vertebral bones were found, suggests he had a role in either dismembering Patricia's body or, at least, in burying her body parts in an attempt to hide the crime.

*Summary*

Hence, there is evidence that Hollister premeditated his involvement with the killing of Patricia and that he had agreed to help kill Patricia or to arrange for her murder in exchange for money. Accordingly, viewing the evidence in the light most favorable to the State, we hold that a rational factfinder could have found beyond a reasonable doubt that Hollister was guilty of the offense of capital murder pursuant to an agreement or contract to kill Patricia Kimmi.

Obviously, our conclusion does not exonerate Hollister. Thus, even if there was a trial error on any of the issues raised by Hollister, we would remand for a retrial. Those remaining issues are fact- and case-specific and do not raise matters of public interest. Therefore, we do not address those issues and instead dismiss those issues as moot. See *State v. Benn*, 364 Mont. 153, 274 P.3d 47 (2012).

Affirmed in part and dismissed in part.

* * *

LUCKERT, J., dissenting: Given the majority's *sua sponte* consideration of whether a criminal defendant's death abates issues in the defendant's direct appeal rather than following the past practice of freely considering all issues raised by a defendant before his or her death, I write to express my disagreement with past decisions and the course adopted by the majority in this case.

As the majority has explained, this court has ruled that "the death of a defendant does not abate his direct appeal as it is in the interest of the public that the issues raised on appeal be adjudicated upon the merits." *State v. Burnison*, 247 Kan. 19, 32, 795 P.2d 32 (1990). These cases ignore the reality that without the defendant there is no one to pursue the appeal.

In other states that consider the merits of an appeal even after the defendant's death, a substituted party carries the burden of establishing the defendant's conviction should be reversed. See, *e.g.*, *Surland v. State*, 392 Md. 17, 36, 895 A.2d 1034 (2006) (Allowing the appeal to proceed "preserves both the presumptive validity of the judgment and the ability of the defendant, through a substituted party appointed for his or her benefit, to maintain the defendant's challenge to it."); *Bevel v. Commonwealth*, 282 Va. 468, 479, 717 S.E.2d 789 (2011) (At common law, "an attainder of felony would not be affected by the death of the defendant" and "his executor or heirs could pursue a writ of error in his stead."); *State v. Webb*, 167 Wash. 2d 470, 478, 219 P.3d 695 (2009) ("If the substituted party appellant is successful . . . then, because remand for a retrial is impossible, the conviction and all associated financial obligations must be abated.").

Likewise, early Kansas cases involved a substituted party. *State v. Ellvin*, 51 Kan. 784, 790, 33 P. 547 (1893) ("[C]osts, although incidental to the punishment inflicted, constitute a separate civil liability in favor of the parties to whom they are due, and from

which the estate of the defendant cannot be relieved except by a reversal of the judgment. A review proceeds here at the instance of the administratrix, and for the benefit of the estate. In case of a reversal, of course no new trial can be had, and necessarily no further liability for costs can arise."); *State v. Fisher*, 37 Kan. 404, 405, 15 P. 606 (1887) (estate administrator substituted for criminal defendant).

More recent Kansas cases have not discussed the need for a substituted party and ignore the reality that Kansas statutes do not provide a criminal procedure for substituting a party in a criminal defendant's appeal. The *Burnison* court, by reasoning that the public has an interest in the appeal, essentially treated the State as the appellant and the party with the ability to ensure the continuation of an appeal. Obviously, however, Hollister is the appellant and, if alive, the one who would control whether an appeal proceeded. Hollister's death leaves no one as the appellant and his attorney without a client. His death does not transform the State—as a representative of the public—into an appellant.

The lack of a criminal procedure to facilitate the continuation of an appeal is a procedural obstacle to the path pursued by the majority. Thus, while I agree the appeal must be dismissed, I would dismiss the entire appeal because of this procedural defect.

In addition, rather than let the conviction stand without full appellate review, I would follow the lead of the federal courts and most other courts and apply the doctrine of abatement *ab initio*. The right to appeal is an integral part of the judicial process, and only with the completion of an appeal is there a final adjudication of guilt or innocence. "[A] defendant who dies pending appeal should not be deprived of the safeguards that an appeal provides." *State v. McDonald*, 144 Wis. 2d 531, 536, 424 N.W.2d 411 (1988). This case illustrates the validity of this approach. The evidence against Hollister is not strong, which raises a strong possibility that any error would necessitate a remand. Despite this, the majority's position leaves Hollister's conviction in place and deprives everyone, including the public, of the safeguards of the appellate process.

19

MORITZ, J., not participating.