NOT DESIGNATED FOR PUBLICATION

No. 122,158

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DAVID L. ESTELL,
*Appellant*.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; AARON T. ROBERTS, judge. Opinion filed December 18, 2020. Affirmed.

*Jacob Nowak*, of Kansas Appellate Defender Office, for appellant.

*Daniel G. Obermeier*, assistant district attorney, *Mark A. Dupree Sr.*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GREEN, P.J., MALONE, J., and MCANANY, S.J.

PER CURIAM: David Estell appeals his convictions for child abuse, aggravated battery, and aggravated endangering a child. He claims there was insufficient evidence to support his convictions.

The child was born in January 2017. The child's Mother believed that Estell was the child's father. Mother and child lived with Estell and Estell's girlfriend, Corrine Farrow, from approximately June 21 to July 3, 2017, when Mother and child moved out. The following day, Mother and child returned to Estell's house for a holiday barbeque.

1

The child appeared happy and well on that occasion. Thereafter, Estell occasionally took custody of the child for a couple of days at a time.

One of those occasions was on July 25, 2017, when Estell brought the child to Estell's house for a barbeque. The child was acting normally when Estell picked him up at 5:30 p.m. Mother checked in on her son by phone at around 10 p.m., and Estell told her the child was doing fine. At midnight, Estell and Farrow sent at least 10 text messages to Mother telling her to come and pick up the child. Mother did not get the messages until she awoke around 7 a.m. the following morning.

Mother immediately called Estell who told her that the child had been crying which Estell attributed to Mother spoiling the child. Mother took the bus to Estell's house to pick up the child and arrived at about 9 a.m. On her way home on the bus, the child was screaming and his eyes were puffy. Mother was concerned so since the bus route took them close to Children's Mercy Hospital, she got off and immediately took the child to the hospital. When she called Estell to tell him she was at the hospital with the child, Estell became upset, called her a bitch, and accused her of being outrageous. Estell's girlfriend, Farrow, then called Mother and accused her of causing trouble for Estell.

The child's treating physician at Children's Mercy Hospital determined that the child suffered brain injuries and rib fractures as a result of child abuse. The brain injuries were new but the rib fractures were healing and probably had been sustained sometime a week to several weeks earlier. As a result, the State charged Estell with the following counts:

Count 1—abuse of a child for brain injuries caused by shaking the child during the period July 25-26, 2017.

Count 2—abuse of a child for rib injuries sustained during the period June 21-July 26, 2017.

Count 3—aggravated battery for brain injuries caused by shaking the child during the period July 25-26, 2017.

Count 4—aggravated battery for rib injuries sustained during the period June 21-July 26, 2017.

Count 5—aggravated endangering of a child for not calling 911 for help after shaking and injuring the child during the period July 25-26, 2017.

The testimony at Estell's jury trial commenced on May 1, 2018.

*The Mother*

Mother testified at trial that the events described above occurred on the afternoon of July 25, 2017, and on the following day. She spoke to Dr. Sara Kilbride at the hospital, who told her that the child had been shaken and described for Mother the child's various injuries.

*Dr. Sara Kilbride*

A.      *Brain injuries*

Dr. Kilbride, a physician at Children's Mercy Hospital, testified at trial that the child was very irritable while she examined him. He was six months old at the time. Mother described to Dr. Kilbride that when Estell picked up the child at 5 or 5:30 the previous evening, the child was happy, smiling, and playful. When Mother picked up the

child the next morning, it appeared to her that something was wrong with the child so she promptly brought him to the hospital.

The child was crying and extremely irritable and fussy throughout Dr. Kilbride's exam. His eyes were extremely swollen and "he was not quite as awake as a normal six-month-old would be." The child had two CT scans and an MRI, which disclosed swelling of the child's entire brain and bleeding in multiple areas of his brain, with clots or slowing blood flow in the back of the child's brain. He also had epidural bleeding from his neck to his shoulder blades and around his spinal cord, as well as retinal hemorrhages in both eyes. Dr. Kilbride testified that these injuries were caused by abusive head trauma, a subcategory of child abuse, and were the "result of his head moving forward and backwards very quickly," such as by shaking the child. Dr. Kilbride stated that the symptoms which she observed in the child and which she evaluated would have arisen "very near" to the events that cause the injuries to his head.

The child suffered seizures while at the hospital. The child had no prior history of seizures. His muscles also stiffened, which was not uncommon for someone with a bad brain injury. Since being discharged from the hospital the child has experienced significant visual impairments, developmental regression, and loss of brain volume that can cause additional developmental impairments. She opined that these injuries were all the result of child abuse.

B.    *Rib injuries*

Dr. Kilbride also reviewed the child's x-rays, which showed seven or eight healing rib fractures on the left side which had been sustained sometime between one week and several weeks earlier. She did not believe the child could have fractured his ribs in attempting to crawl or walk. She found no medical cause for the fractures and concluded the rib fractures were the result of child abuse.

4

*Detective Brittanie Pruitt*

Detective Brittanie Pruitt focused her investigation on Farrow and Estell, who had both been involved in a 2004 case in which Estell had been convicted of child abuse. Estell and Farrow agreed to speak to Pruitt.

Pruitt began her interview with Farrow by telling her that she planned to charge both Farrow and Estell with child abuse. She also said she would recommend that the State find Farrow's children were not safe in her care.

Detective Pruitt then went to speak with Estell for about 30 minutes. Estell denied harming the child but told Pruitt that the child woke up around 1 a.m. on July 25, 2017, having what Estell thought was a seizure. Pruitt left the interview room, asking Estell to stay. Instead, Estell left the building. The police initiated a search for Estell, who was later found running down the road and through an apartment complex area.

After leaving Estell, Pruitt returned to continue her interview of Farrow. At that point, Farrow told her that Estell had shaken the child and kneed the child in the ribs. Farrow demonstrated on a doll. She shook the doll, saying, "'[S]top crying, what is wrong with you, why are you crying?'" She also demonstrated with the doll how Estell kneed the child in the side. But she claimed that Estell kneeing the child was accidental. Farrow admitted that she and Estell failed to call 911. For our purposes, Farrow's statement about Estell inflicting the child's rib injuries is of no moment since the jury ultimately acquitted Estell of child abuse and aggravated battery for those injuries.

Video recordings of Pruitt's interviews of Farrow and Estell were played for the jury.

5

*Corrine Farrow*

Farrow testified that the child was sleeping when she went to bed on the night of July 25, 2017. Around 1 or 2 a.m., the child woke up crying. He was clinching and grinding his teeth, biting his tongue, and his fists were clinched. She said they tried calling Mother but could not reach her. The child eventually went back to sleep.

Farrow recanted her prior statements to Detective Pruitt and denied ever seeing Estell harm the child. She said she was scared when she spoke to Pruitt because Pruitt had threatened to take her son away and charge her with a crime if she did not say that Estell harmed the child. Farrow said she told Pruitt several times that Estell did not hurt the child.

*Dr. Thomas Young*

Estell called forensic pathologist and former Jackson County Medical Examiner Dr. Thomas Young to testify on his behalf. After reviewing the child's medical records and the statements of the various witnesses, Dr. Young opined that in the early hours of July 26, 2017, the child experienced a seizure and the subsequent bleeding in his brain, which he believed may have been caused by dural venous sinus thrombosis (DVST), a condition that can occur without trauma.

*Dr. James Anderst*

In rebuttal the State called Dr. James Anderst, a physician at Children's Mercy Hospital. After examining the child and his medical records, Dr. Anderst opined that the child's injuries were caused by trauma, not DVST. He concluded that the bleeding in the child's brain was consistent with trauma that involved whiplash to the child's neck.

The jury convicted Estell of counts 1, 3, and 5—the crimes related to the child's brain injuries on July 25 and July 26, 2017, and the failure of Estell to call 911 for help. Estell was acquitted of counts 2 and 4—the crimes related to the events between June 21 and July 26, 2017, when the child purportedly suffered the rib fractures.

The district court sentenced Estell to 213 months in prison followed by 36 months of postrelease supervision. This appeal followed. On appeal, Estell contends the evidence is insufficient to support his convictions.

Estell passed away in December 2019. Nevertheless we have jurisdiction to consider this appeal notwithstanding Estell's death because an outcome favorable to the defense would exonerate Estell from these crimes. See *State v. Hollister*, 300 Kan. 458, Syl. ¶ 1, 329 P.3d 1220 (2014).

ANALYSIS

In cases like this in which the sufficiency of the evidence in a criminal trial is challenged, we review the evidence in the light favoring the State to determine if a rational fact-finder could have found the defendant guilty beyond a reasonable doubt based upon that evidence. In doing so we do not reweigh the evidence, resolve conflicts in the evidence presented, or redetermine the credibility of the witnesses. *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018).

*Child Abuse and Aggravated Battery*

Estell's first contention on appeal is that the evidence produced at trial was insufficient to support his convictions for child abuse and aggravated battery. These convictions relate to the child's brain injuries.

7

Estell asserts that the State's evidence consisted of the "unreliable, recanted statement Corrine Farrow made to Detective Pruitt." You will recall that Farrow told Pruitt that Estell had shaken the child. While Estell acknowledges that on appeal we cannot reweigh the evidence or reassess Farrow's credibility, he argues that in rare cases Kansas courts have overturned convictions based on evidence that was so unbelievable as to be insufficient to support a conviction beyond a reasonable doubt. See *State v. Matlock*, 233 Kan. 1, 4-6, 660 P.2d 945 (1983); *State v. Naramore*, 25 Kan. App. 2d 302, 322-23, 965 P.2d 211 (1998).

Estell relies in particular on *Matlock*, in which our Supreme Court overturned a rape conviction for insufficient evidence. There, the State's only witness was the complainant who asserted that the defendant, her adoptive stepfather, raped her at his home where several family members were present. On appeal, the court listed 14 reasons why the complainant's testimony was unreliable and noted that there was no other evidence presented at the trial to corroborate the complainant's testimony. Reversing Matlock's conviction, the court concluded that the "uncontradicted facts cast so much doubt upon the credibility of the prosecutrix that no rational factfinder could have believed her testimony and found the defendant guilty beyond a reasonable doubt." 233 Kan. at 6.

In *State v. Brinklow*, 288 Kan. 39, 200 P.3d 1225 (2009), the Kansas Supreme Court characterized *Matlock* as "aberrant," noting that it was "perhaps the only case of its kind in this state where the Supreme Court directly weighed the evidence and assessed the credibility of the prosecutrix to reverse a conviction for rape." 288 Kan. at 53; see *State v. Kettler*, 299 Kan. 448, 470, 325 P.3d 1075 (2014).

*Matlock* is distinguishable from the present case. Inconsistency in a witness' testimony does not necessarily render the evidence insufficient to support a conviction. It was within the province of the jury to evaluate whether Farrow was telling the truth when

Detective Pruitt interviewed her or when she testified later at trial. See *Kettler*, 299 Kan. at 471-72 (finding that it was the jury's duty to determine a witness' credibility when witness gave inconsistent statements and had recanted a sworn statement).

Besides, Farrow's testimony was not the only evidence used to support these convictions. Mother testified to the events described earlier in this opinion. Dr. Kilbride testified that the child's injuries resulted from recently having been shaken. The evidence supports the conclusion that Estell had custody of the child when the harm occurred. There was ample evidence to support Estell's convictions for child abuse and aggravated battery without consideration of Farrow's testimony.

*Aggravated Endangering of a Child*

Estell also challenges his conviction for aggravated endangering the child. This is based on his failure to call 911 for help after having shaking the child.

Aggravated endangering a child is "[r]ecklessly causing or permitting a child under the age of 18 years to be placed in a situation in which the child's life, body or health is endangered." K.S.A. 2019 Supp. 21-5601(b)(1). "A person acts 'recklessly' or is 'reckless,' when such person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." K.S.A. 2019 Supp. 21-5202(j).

Estell asserts that he "undoubtedly disregarded a risk when he and [Farrow] attempted to care for the [child] themselves instead of calling 911 after he woke up in the middle of the night crying, biting his tongue, clenching his fist, and not opening his eyes." Nevertheless, he contends these symptoms did not create a substantial and unjustifiable risk and that his actions were not a gross deviation from the standard of care

9

a reasonable person would have exercised under the circumstances. He notes that Mother thought that the child merely had a worsening of his eye infection symptoms. He argues that "[i]f the other adults who saw [the child] believed those were the cause of his signs of distress, it cannot be said that those signs presented a substantial risk and that Mr. Estell grossly deviated from the reasonable standard of care for not seeking immediate medical attention."

Estell's argument focuses only on the signs of distress the child exhibited, not the cause of those signs. The jury found that Estell committed acts of child abuse and aggravated battery which brought on the symptoms he observed which were caused by the injuries he inflicted on the child. The jury did not believe these symptoms were spontaneous or caused by the child's underlying health condition. In finding Estell guilty, the jury necessarily concluded that Estell recklessly permitted the child's life, body, and health to be endangered by consciously disregarding the substantial and unjustifiable risk of further injury to the child from his criminal conduct by not calling 911 for help, an action which any reasonable person would have done under the circumstances.

We conclude there was sufficient evidence to support Estell's conviction for aggravated endangering of a child.

Affirmed.