IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 94,435

STATE OF KANSAS,
*Appellee*,

v.

DOUGLAS S. BELT,
*Appellant*.

SYLLABUS BY THE COURT

1.

Under *State v. Hollister*, 300 Kan. 458, 329 P.3d 1220 (2014), the death of a criminal defendant during the pendency of a direct appeal does not abate the prosecution, but the appellate court need not consider the merits of every issue raised on appeal. An appellate court should consider whether an issue: (1) is of statewide interest and of the nature that public policy demands a decision, such as those issues that would exonerate the defendant; (2) remains a real controversy; or (3) is capable of repetition. Only issues meeting at least one of these criteria should be addressed. In this capital case, the court addresses only three issues raised by the defendant in his direct appeal because each has the potential to exonerate him on one or more of his convictions.

2.

On the record in this case, the State's evidence to support the attempted rape underlying the defendant's conviction for capital murder was sufficient.

3.

On the record in this case, the State's evidence to support the defendant's conviction for level three aggravated arson was sufficient.

1

4.

A conviction for attempted rape, when the same attempted rape has been used to support a conviction for capital murder under K.S.A. 21-3439(a)(4), is multiplicitous; and the conviction for attempted rape must be reversed and the sentence for that crime vacated.

Appeal from Sedgwick District Court; REBECCA L. PILSHAW, judge. Opinion filed October 21, 2016. Affirmed in part and reversed in part.

*Sarah Ellen Johnson*, of Capital Appellate Defender Office, argued the cause, and *Rebecca E. Woodman* and *Meryl Carver-Allmond*, of the same office, were on the briefs for appellant.

*Boyd K. Isherwood*, assistant district attorney, argued the cause, and *David Lowden*, chief attorney, appellate division, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were on the brief for appellee.

The opinion of the court is delivered by

BEIER, J.: This is a direct appeal in a capital case.

Because appellant Douglas Belt died in prison during the pendency of this appeal, we follow *State v. Hollister*, 300 Kan. 458, 329 P.3d 1220 (2014) (death of defendant during pendency of direct appeal does not abate prosecution; appellate court need not consider merits of every issue raised on appeal). Under *Hollister*, following the death of an appellant, "an appellate court should consider whether an issue: (1) is of statewide interest and of the nature that public policy demands a decision, such as those issues that would exonerate the defendant; (2) remains a real controversy; or (3) is capable of repetition." 300 Kan. 458, Syl. ¶ 1. Only issues meeting at least one of these criteria should be addressed. Accordingly, we address only three issues that could posthumously

exonerate Belt on one or more of his convictions: (1) Did the State present sufficient evidence of attempted rape to support Belt's conviction of capital murder? (2) Did sufficient evidence support Belt's conviction of level three aggravated arson? (3) Was Belt's attempted rape conviction multiplicitous with his capital murder conviction?

FACTUAL AND PROCEDURAL BACKGROUND

Belt's challenges to his convictions based on the sufficiency of the evidence to support them necessitate a thorough review of the grisly evidence in this case.

The victim in this case, L.G., was a housekeeper at a Wichita apartment complex. She and her live-in boyfriend, Chris Branch, were acquainted with Belt as former neighbors.

On the morning of June 25, 2002, a manager at the complex where L.G. was employed responded to a resident's complaint that an adjacent empty unit's smoke detector had been alerting intermittently. The manager and a maintenance supervisor entered the unit together, finding smoldering carpet in the living room and smoke in the air. The manager saw that the bathroom light was on, and she walked farther into the apartment to investigate. The floor of the bathroom was covered in a powdered cleaner. Moments later, the manager heard the maintenance supervisor scream and turned to see a nude, decapitated body, later identified as L.G., lying in the bedroom. The manager and supervisor then ran out of the apartment.

Law enforcement officers arrived and secured the scene. Although investigators canvassed the neighborhood, suspended trash collection in the area, and searched nearby bodies of water, L.G.'s head was never found.

3

Crime Scene Investigator Andrew Maul processed the crime scene. Several areas of the living room and bedroom carpet were stained with blood. There were areas of burned and melted carpet in the living room near a patio door and in the bedroom. Maul cut carpet samples for later testing. He also collected a sample from a blood smear on a shelf inside a refrigerator and 20 samples from bloodstains throughout the apartment.

Maul conducted a photographic inventory of the apartment. In the living room there was a partially-smoked Marlboro cigarette just inside the front entrance, a maid's cleaning cart, and an upside-down CD player/radio and red bottle cap on the floor. Maul also found a tooth in a pool of blood in the living room. Two sets of keys and 79 cents in coins were on the kitchen counter. An empty bottle of vodka was against a wall near the bedroom. In the bedroom, Maul found a pair of white tennis shoes, a pair of women's underwear, a pair of jeans with a black belt, a t-shirt, an upper denture plate with a missing tooth, and a Midol pill in its package. The jeans and t-shirt were covered in L.G.'s blood. Inside one of the jeans' pockets was a note with the name "Doug" and a phone number written on it. All of these items were collected for later testing.

A door off the living room opened to a small patio. The patio was surrounded by a 4-foot wood railing. Maul located three stains he believed to be blood on the railing. He collected samples from them. The patio door showed signs that it had recently been pried open, and the bolt from the patio door deadbolt lock was lying on the floor inside the apartment.

Both the kitchen and bathroom floors were covered in a thick layer of powdered cleaner, consistent with Comet. Powdered cleaner also covered the bathroom sink, vanity, and toilet. The pattern of the powdered cleaner on the bathroom floor appeared to have had hair dragged through it.

Dr. Jaime Oeberst, Sedgwick County deputy coroner, arrived on the scene, examined L.G.'s body, and then had the body transported to the Sedgwick County Regional Forensic Science Center. In her autopsy report and later trial testimony, Oeberst said that decapitation had happened between the third and fourth cervical vertebra and that the body showed multiple stab wounds to the chest, arms, back, genitalia, and anus. Oeberst eventually testified that the decapitation was the result of several different cuts rather than a single blow and that L.G. was alive at the time that she suffered some of the cuts around her neck. Oeberst arrived at this opinion because she noted a vital response, *i.e.*, a hemorrhage associated with injuries in the muscle and soft tissue, which indicates there was blood pressure at the time an injury was inflicted.

L.G.'s left shoulder had "poke marks" that were the result of the "[t]ip of a sharp object being forced into the skin." And Oeberst identified similar "poke marks" at the base of L.G.'s neck that were distinct from the decapitation wounds. A deeper stab wound on L.G.'s right shoulder measured 3/4 of an inch deep. The poke marks on L.G.'s left shoulder and neck and the deeper wound on her right shoulder all showed signs of a vital response.

Oeberst also noted that L.G. had been stabbed four times in the left side of her chest. Two stabs punctured her heart. One of the wounds was 5 inches deep, and the other was nearly 7 inches deep. Another stab penetrated L.G.'s left lung and was 3 inches deep. The final stab wound was 6 and 3/4 inches deep, and the stab pierced L.G.'s liver and stomach and penetrated into her spine.

Oeberst observed blood inside L.G.'s trachea and dark spots in her lung tissue. These observations led Oeberst to conclude that L.G. had inhaled blood into her lungs.

Both undersides of L.G.'s forearms showed defensive injuries. Oeberst recorded three sharp force injuries to L.G.'s right forearm and a single sharp force injury to her left

5

forearm. In addition, Oeberst counted at least 63 separate bruises on L.G.'s arms and legs, with the majority the result of fresh injuries.

Two shallow sharp force injuries ran the length of L.G.'s body on her back. The cuts penetrated just below the skin. Oeberst did not notice any vital response on these injuries and concluded that they were inflicted after death.

L.G.'s genitalia and anus showed signs of mutilation, including several intersecting sharp force injuries to L.G.'s genitalia and two sharp force injuries on either side of L.G.'s anus. Between L.G.'s anus and vagina, Oeberst noted a penetrating injury through the skin and into L.G.'s vagina. Oeberst concluded that all of these injuries had been inflicted after death.

Oeberst also noted that blistering on the left side of L.G.'s body, including charring on her left arm, was consistent with skin that had been burned with a volatile hydrocarbon like lighter fluid or gasoline. Oeberst took two tissue samples from the area of damage on L.G.'s body to test for the presence of accelerant. Testing confirmed the presence of a medium-range petroleum distillate accelerant.

Oeberst contacted a sexual assault nurse examiner to conduct an examination of L.G.'s body. The nurse noted areas of redness in L.G.'s genital region, which she initially identified as "normal." After having her report peer-reviewed, the nurse changed her finding about the redness, concluding that the discoloration indicated blunt force trauma. She also eventually concluded that areas of redness were consistent with some type of sexual contact within 72 hours before L.G.'s death.

Both Oeberst and the nurse collected samples from L.G.'s body for later DNA testing. Neither found signs that L.G. had been menstruating at the time of her death.

Douglas J. Monty, a special agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives and a certified fire investigator, conducted an arson investigation in the apartment where L.G.'s body was discovered. He saw fire damage to the carpet in the living room and bedroom and soot collected around the return air vent in both rooms. In the living room, the burned area in the carpet was roughly 56 inches by 70 inches. There was also a linear burn line that extended from the living room toward the bathroom, which Monty associated with the presence of accelerant. In the bedroom, there was a linear burn pattern from the doorway all the way to a corner of the room, along with moderate smoke damage to the baseboards in the corner. Monty also observed slight radiant heat damage to L.G.'s left arm, which was located in close proximity to the fire. He determined that the fire damage to the carpet in the living room and bedroom was not caused by one continuous fire but, instead, was the result of two separate, physically unconnected fires.

Monty collected carpet samples from the burned areas as well as control samples for additional testing. Test results confirmed the presence of a medium-range petroleum distillate accelerant, consistent with charcoal lighter fluid, gasoline, and certain industrial cleaning solvents, present in both the burned carpet samples and the unburned control samples. Monty explained that the presence of accelerant on the control samples likely occurred as a result of direct application of accelerant to the unburned carpet or from air flow from the air conditioning system causing the petroleum vapors to transfer to the control area.

Monty opined that both unconnected fires were caused by an individual placing a handheld open flame device, like a cigarette lighter, in contact with the ignitable liquid. Once the open flame was put in contact with the ignitable liquid, Monty explained, there would have been an initial flash of flame as the vapors sitting in the carpet were ignited. The initial flash would have died down to a height of 2 inches to 3 inches, in part because

carpet manufactured since the early 1970s is flame resistant, causing the carpet to burn horizontally at a relatively slow pace.

The fires were set without the consent of the property owner.

Video surveillance footage from a nearby liquor store showed that L.G. had entered the liquor store shortly after 6 p.m. the evening before her body was discovered. While in the store, L.G. purchased a bottle of vodka that was the same type and size of the bottle found at the crime scene. The apartment manager, who was in a car parked outside the complex's office building at 6:15 p.m., had seen L.G. walking from the liquor store with a brown paper bag. At least two residents saw a woman who matched L.G.'s description outside the complex later that evening. Both reported that the woman appeared drunk or on drugs. One of the residents saw the woman at 10:30 p.m. and believed she was "extremely intoxicated" because she was walking off-balance, wobbling, swaying from side to side, and looking straight up into the sky.

Investigators focused their early attention on Branch. Branch and L.G. had been in a relationship for almost a year at the time of her death. The relationship was marred by violence and substance abuse. Wichita police officers had responded to domestic violence calls originating from the couple's apartment on multiple occasions, and the violence between them had been escalating. According to Branch, the couple would split a pint of vodka every evening after work. On weekends, the couple would consume a similar amount of alcohol and occasionally smoke crack cocaine.

Branch worked for a construction company. On the day L.G.'s body was discovered, Detective Randall Reynolds went to Branch's worksite to pick Branch up for questioning. Reynolds confirmed that Branch had been at work since at least 7 a.m. Reynolds informed Branch that he was investigating a missing person report regarding L.G., but he did not inform Branch that L.G. had been found dead. Before transporting

8

Branch to the police station, Reynolds removed a knife with a 3 and 1/2-inch blade that had been clipped to Branch's belt. When a detective told Branch later that L.G. had been found dead, Branch began to cry.

The investigation expanded beyond Branch when test results revealed that there was DNA from an unknown contributor mixed with L.G.'s DNA in the largest of the three stains on the patio railing. The testing excluded Branch.

Detective John Martin first spoke with Belt in the evening of the day that L.G.'s body was discovered. At that point, law enforcement wanted to question Belt about Branch. In a recorded interview, Belt confirmed that he knew Branch and that Branch had come over to Belt's apartment for about 30 minutes the previous evening looking for L.G. Belt said that he had known Branch and L.G. for a year. During Branch's visit, Belt and Branch tried to activate Belt's new cell phone, and the pair tried to call each other's phones. Belt offered Branch a beer and the two also drank some whisky. When Branch left, he told Belt that he was leaving to go fishing.

Without prompting, Belt told Martin that he tried to avoid Branch and L.G. as much as possible because they were "really bad alcoholics." According to Belt, Branch would become violent when he drank alcohol and L.G. was "just a nasty old drunk." Belt said that, a few months earlier, he had to stop Branch from beating L.G. in Belt's apartment. Belt also said that L.G. would occasionally knock on his door and that he would not answer. Belt said both L.G. and Branch would come over at times looking for alcohol.

On November 8, 2002, police officers responded to a call regarding an armed robbery at a Wichita drugstore. Dispatch informed officers that the robbery suspect was a white male and that he was driving a white car without a tag. An officer saw a car matching the description and began to follow it. The driver, Belt, began throwing items

out of the driver's side window. When Belt was apprehended, officers took him to the drugstore, and he was identified as the robber. Among the items he had thrown out of the car was a silver and black handgun-style BB gun. A crime scene investigator later swabbed the BB gun for possible DNA evidence.

Police began to question Belt about the robbery, but the interrogation ceased after Belt invoked his right to remain silent. Pursuant to a search warrant, Detective Thomas Fatkin acquired two oral swabs from Belt, ostensibly for comparison against any DNA found on the BB gun. But the DNA from Belt's oral swabs also was compared to the DNA from the unknown contributor to the large patio railing stain. The profile generated from the stain was consistent with a mixture consisting of L.G.'s and Belt's DNA.

While Belt was in custody on charges stemming from the robbery, detectives interviewed him about the murder of L.G. Before questioning, Belt was advised of his rights, and he executed a written waiver. The interview was videotaped.

At the outset of the interview, Belt admitted that he was with L.G. in the apartment on the night of her murder and that he was probably the last person to see her alive. He said he went to the apartment for some "hanky panky," but it did not happen. Belt commented that "[s]he had been drinking and I had been drinking and I got to following her." Later, Belt claimed that L.G. had invited him over to the apartment, and he made no further reference to "following" her.

Belt did not remember the particular apartment number during the interview, but he said L.G. had given him the unit number that night. Belt knew L.G. cleaned apartments at the complex, had access to apartment keys, and occasionally spent the night in a vacant unit.

10

Belt said L.G. probably had invited him to come over because he had alcohol. Belt admitted that he, Branch, and L.G. would drink and occasionally use crack cocaine together. He and Branch would smoke or inject the drug, but L.G. always smoked it. Belt stated that he had tried to "hook up" with L.G. in the past when the two had been drinking, but nothing ever happened between them.

Belt said he decided to walk over to visit L.G. a couple hours after Branch had left his apartment. By that time, Belt said, he had consumed two to three mixed drinks and six to eight beers. When he arrived, he knocked on the front door. He thought L.G. had "passed out a little," but she made it to the door and let him in. Belt said it was very hot inside and he was sweating profusely. Belt noted that the apartment was vacant and appeared to be clean, but he did not notice L.G.'s cleaning supplies inside.

Belt claimed that he and L.G. talked for a while in the living room before he leaned in and started kissing her. Belt said they walked back to the bedroom and lay down on the carpet. They continued to kiss and Belt lifted L.G.'s shirt and sucked on her breast. Then, Belt said, he unbuttoned her pants and penetrated her vagina digitally. At that point, L.G. put her hand on his chest to stop him and said something to the effect that "this is not right" and she could not continue because of Branch. According to Belt, he replied, "You're right. I have a girlfriend anyway." Belt told detectives he was "a complete gentleman" and stopped his sexual advances.

Belt said he and L.G. did not engage in sexual intercourse or oral sex. Belt told detectives that he never removed any of his clothing inside the apartment and that his penis was never outside his pants. He claimed that L.G. kept her pants and shirt on at all times and that he never removed them from her body.

According to Belt, he and L.G. then had a brief conversation; and he told her that Branch had stopped by looking for her earlier that night. Belt went into the kitchen and

11

opened the refrigerator to see if there was any beer, but it was empty. Belt said he thought he also used the bathroom. Belt said he started smoking a Marlboro cigarette and thought he had given one to L.G. as well.

About 5 minutes later, Belt said, he and L.G. heard a knock at the front door of the apartment. Belt said L.G. looked out the peephole and told Belt he had to go. Belt said L.G. opened the side door leading to the patio, and he walked out, put his hands on the patio ledge, "hopped" over the patio railing, and "took off" back to his apartment. Belt told detectives he never saw who was at the front door, but he assumed it was Branch.

Belt was adamant that L.G. was not injured or bleeding when he left the apartment and that there was no disagreement, argument, or physical altercation between the two. Likewise, Belt said he did not sustain any injuries during his time with L.G. But Belt said he had noticed a small cut or scratch on his left palm when he got back to his apartment. He thought he might have cut his hand on a piece of glass or small pebble in the carpet when he lay next to L.G. in the bedroom, but he also said he might have been injured when he jumped over the patio railing or when he walked home. Belt thought the scratch drew a little blood, but it was not bleeding when he got home. Belt did not recall whether there was any dried blood around the scratch.

Belt said he stayed at his apartment the rest of the night, and sometime after lunch the next day he left his apartment to check his mail and noticed crime scene investigators at the complex where L.G. worked. He asked a maintenance worker what was happening, and the worker said there had been a murder. Belt went back to his apartment and watched coverage of the crime on television.

Belt told detectives that, after L.G.'s murder, he let Branch stay with him at his apartment for a few days because Branch had nowhere else to go. Belt said Branch could

not believe L.G. had been murdered and that Branch broke down and cried when he read a story about the murder in the newspaper.

Belt explained that he had not shared all of this information with Martin during his June 25, 2002, interview because Martin did not ask. Belt said he did not volunteer the information for fear someone would point the finger at him.

After Belt provided his account of the events, detectives informed him that DNA testing on the porch railing stain had revealed a mixture of Belt's and L.G.'s DNA. Detectives told Belt that such a result was possible only if he and L.G. were both bleeding when he left the Newport apartment.

Belt remained adamant that L.G. was not bleeding at the time he left, unless she had been menstruating. He continued to express uncertainty about whether he had scratched his hand on a pebble in the carpet, while jumping the patio railing, or on his way home; but he assumed he must have cut it on the carpet if his blood was on the patio ledge. Belt asserted again that he did not have sexual intercourse with L.G. and that he had stopped his advances soon after digitally penetrating her vagina. Belt claimed that he was not angry when L.G. stopped his advances; he did not hit her; he did not assault her; he did not rape her; and he did not kill her.

The interview ended when Belt told detectives he was done and wanted to talk to an attorney.

At some point after the interview, Belt's DNA was linked to six unsolved rape cases committed in four Kansas counties between 1989 and 1994.

After learning about the other cases, Fatkin requested DNA testing of L.G.'s clothing. Specifically, Fatkin sought testing of the clothing in areas that would be

13

consistent with another person disrobing the one wearing the clothing, *e.g.*, shoes, cuffs of pants, and pockets.

Shelly Steadman, laboratory manager at the Sedgwick County Regional Forensic Science Center, compared a known DNA profile of Belt against collected samples from the crime scene.

Steadman tested a cutting of L.G.'s underwear and obtained a profile that was a mixture of three individuals—two major contributors and a minor contributor. The major contributors to the profile were consistent with L.G. and Branch, and the minor contributor was consistent with Belt. Steadman also tested samples from three stains on L.G.'s jeans. Steadman found combined profiles consistent with L.G. and Belt on a stain found inside the front right pocket of the jeans and on a stain on the exterior of the left pocket. Steadman generated a third DNA profile from the cuff of L.G.'s jeans, which was a mixture consistent with L.G. as a major contributor and Belt as a minor contributor. L.G.'s shoes, specifically each heel and the toe box of the left shoe, also produced DNA profiles consistent with L.G. as a major contributor and Belt as a minor contributor.

At the time of L.G.'s murder, Raymond Fisher had lived at the apartment complex where L.G. worked. Earlier in the investigation, Fisher had told investigators that he saw a small white car driving erratically in the complex parking lot at 4 a.m. the morning L.G.'s body was discovered. Fisher had heard tires screeching and then saw the white car come up behind his car very fast. Fisher stopped at an automated security gate and waited for it to open. The white car tried to get around Fisher, but there was not enough room to do so. After the gate opened, Fisher pulled out onto the road. The white car followed and continued to try and pass Fisher, but a raised road divider prevented the car from passing. In his rearview mirror, Fisher saw that the driver was the only occupant in the white car and that the driver was a man. When Fisher stopped at an intersection, the white car passed him on the driver's side and went through the stop sign without stopping.

14

On the day that L.G.'s body was discovered, a detective showed Fisher a photo lineup that included a picture of Branch; Belt was not included in the photo lineup. Fisher was unable to identify the driver of the white car from the photo array. Nearly a year later, on June 9, 2003, Fatkin showed Fisher a photo lineup that included Belt in position 3. Fisher noted that the persons in positions 3 and 5 both looked like the driver of the white car. Fisher noted that the person in position 5 "looks to be closest to who I saw." Fisher would eventually testify that he was able to see the driver's face when the white car passed him; he and the other driver locked eyes for a moment.

The State filed a four-count complaint against Belt. Count 1 alleged that Belt committed capital murder under K.S.A. 21-3439(a)(4) (Furse) by intentionally killing L.G. during the commission of, or subsequent to, the crime of attempted rape. Count 2 charged Belt with the crime of attempted rape under K.S.A. 21-3502(a)(1)(A) (Furse) (victim overcome by force or fear), alleging the overt act of "forcibly remov[ing] L.G.'s clothing." In the alternative, Count 3 charged Belt with the crime of attempted rape under K.S.A. 21-3502(a)(1)(C) (Furse) (victim incapable of giving consent because of effect of alcoholic liquor, narcotic, or drug), alleging the overt act of "remov[ing] L.G.'s clothing." The final count charged Belt with aggravated arson under K.S.A. 21-3719 (Furse), alleging Belt set a fire to an occupied dwelling that "result[ed] in a substantial risk of bodily harm."

Before trial, the State filed a motion seeking admission of K.S.A. 60-455 evidence regarding the sex offenses Belt had allegedly committed between 1989 and 1994. The State argued that the prior crimes evidence was relevant to prove Belt's intent when he removed L.G.'s clothing. In the State's view, Belt had offered an "innocent acts defense" when he told detectives that the sexual activity with L.G. was consensual, placing Belt's intent in issue. Belt filed a response in which he argued that his intent was not at issue and, in the alternative, that the evidence was more prejudicial than probative. After a

15

hearing on the motion, the district court judge ruled that the evidence was admissible for the limited purpose of proving intent and/or plan. The district court found striking similarities existed between the facts of the instant case and the facts of the six rapes.

The State's case against Belt consisted of Belt's opportunity to commit the crime, the DNA evidence, Belt's recorded statements, Fisher's equivocal identification of Belt, and a significant amount of K.S.A. 60-455 evidence consisting of testimony by the six rape victims and three Kansas Bureau of Investigation (KBI) agents that worked on those cases. Through cross-examination, the defense attempted to cast Branch as the more probable suspect and questioned the thoroughness of the investigation.

Several witnesses testified that L.G. was in an abusive relationship with Branch.

The apartment manager testified that L.G. had arrived at work with bruises and black eyes on a number of occasions. At one point, the manager sent L.G. home because her eye was swollen and required L.G. to get a doctor's note authorizing her to return to work.

L.G.'s adult son, Herman, testified that he saw Branch hit L.G. on more than one occasion. During one incident, Herman and a friend went to the apartment L.G. and Branch shared after L.G. called Herman and said she and Branch were fighting. Shoving between Herman and Branch ensued. According to Herman, Branch lunged for a knife during their scuffle, but Herman's friend hit Branch over the head with a vodka bottle. Herman described the knife as a pocket knife with a 3- or 4-inch blade. Despite this history, Herman also testified that his mother seemed happy when he talked to her on the phone the day before her body was discovered. He said that L.G. told him that Branch was making dinner and that she was getting ready to eat. Herman testified that he spoke to his mother daily on the phone, and, as he always did, he asked if everything was fine between her and Branch. L.G. replied that everything was fine, and, according to

16

Herman, she gave no indication that she and Branch were having problems that particular night.

Branch testified that he and L.G. "fought all the time" and that he was physically abusive. He admitted to hitting L.G. in the face and giving her a black eye on at least two occasions. On the morning of June 24, 2002, however, he and L.G. had sexual intercourse before he went to work. After work, he had stopped by a liquor store and purchased a pint of vodka and a quart of beer, as was his usual practice. He began cooking dinner for himself and L.G., and the couple finished the vodka. Before dinner was ready, Branch testified, L.G. told him that she was going to take out the trash and left their apartment. According to him, she never returned and he never saw her again.

According to Branch, L.G. would sometimes spend the night in a vacant apartment in the complex where she worked in order to avoid conflict at home. Although the couple was not fighting, Branch said, he thought that L.G. may have gone to the liquor store to buy a bottle of vodka and then to a vacant apartment in order to drink it by herself. Branch walked toward the liquor store but did not see L.G. While he was out, he stopped by Belt's apartment, where Belt was home alone, programming his cell phone. Branch and Belt drank whisky while Belt continued to work on his phone. Belt gave Branch his new phone number, and Branch used his cell phone to call Belt's phone. Branch and Belt exchanged several calls as they tried to activate the phone. After consuming several drinks, Branch left for his apartment.

Branch testified that he eventually passed out on his couch that evening. Phone records indicated that Branch's cell phone dialed a friend of his at 1:58 a.m. on June 25, 2002. Branch testified that he may have accidentally dialed the number when he tried setting the alarm on his phone. He was certain that he did not intentionally dial the number because he believed his friend was in jail at the time.

17

In the morning, Branch left for work. Because L.G. did not have her own cell phone, Branch left his cell phone at their shared apartment in hope of reaching her later. When L.G. had stayed out on earlier occasions, Branch had left his phone and called her during his lunch hour from a phone he borrowed at work. As he had done before, Branch borrowed a phone and tried to reach L.G. during his lunch hour, but he was unsuccessful. Phone records supported Branch's testimony.

Branch denied any involvement in L.G.'s death.

On cross-examination, Branch stated that he was suspicious L.G. was cheating on him with Belt and another man. He also said he had told investigators that singed hair on his knuckles was from refilling his Zippo lighter.

Oeberst testified about her findings and conclusions from the autopsy, estimating that the blade of the murder weapon was 3 to 6 inches long. She further testified that she did not believe the blade had a serrated edge because she did not observe any parallel marks on L.G.'s skin, but she could not rule out the possibility that a serrated blade had been used.

Steadman testified at trial about her findings and the random match probabilities for certain DNA evidence, *i.e.*, the probability of selecting a person at random who could also not be excluded from a profile. The random match probability for the porch railing stain was 1 in 158 million in the Caucasian population, 1 in 3.26 billion in the African-American population, and 1 in 212 million in the Hispanic population. The DNA profile generated from L.G.'s interior jeans pocket was 1 in 589 million in the Caucasian population, 1 in 16.5 billion in the African-American population, and 1 in 538 million in the Hispanic population.

Kelly Robbins, a bloodstain-pattern analyst with the KBI, provided extensive testimony about her findings and conclusions based on her observations at the scene of the murder. Robbins believed that L.G. was attacked in the living room, suffered a bleeding head injury, was in the bathroom at some point while bleeding, and suffered several blows in the bedroom. Robbins could not estimate the length of time between L.G.'s first injury and last, but she did testify that clotted blood found on the scene suggested there was a period of time that passed between L.G.'s first injuries and others that were inflicted.

Consistent with its pretrial filings, the State also admitted substantial K.S.A. 60-455 evidence related to the six rapes committed between 1989 and 1994 and linked to Belt through DNA evidence. The six victims and three KBI investigators testified. Defense counsel lodged a continuing objection to the detailed testimony of the victims and renewed an earlier objection to the investigators' testimony. We do not describe all of this evidence from these witnesses here; as explained in relation to the first issue on sufficiency of evidence to support Belt's capital murder conviction, we will not consider it in our legal analysis.

The State ultimately moved to dismiss Count 3, which charged attempted rape based on L.G.'s level of intoxication. Belt did not object, and the district court granted the motion.

The defense called three witnesses.

The first was L.G.'s daughter, April, who testified about an incident that happened a few days before L.G.'s murder. According to April, Branch was a jealous man. And, on June 22, 2002, L.G. had told Branch that she was going to go talk with a man named Les at the apartment complex where she worked. Branch asked for Les' apartment number, but L.G. refused to give it to him. Apparently Branch said, "[L.G.], why in the fuck don't

19

you tell me his apartment number as I've known you for years and you've only known him for three months?" Branch became angry and tried to get April's husband to drive him over to the apartment complex so that he could look for Les' apartment. April's husband refused.

The defense also called two crime scene investigators who had processed the crime scene and the apartment L.G. and Branch shared. Questioning by the defense attempted to cast doubt on the thoroughness of the investigation.

Belt did not testify in his defense.

The jury found Belt guilty on all three remaining counts.

In the penalty proceedings, the State alleged that two aggravated circumstances support a death sentence: (1) Belt committed the crime in order to avoid or prevent a lawful arrest or prosecution, and (2) Belt committed the crime in an especially heinous, atrocious, or cruel manner.

Belt offered the following mitigating circumstances:

"1. It is possible for the jury, the sole trier of fact in this matter, to consider a lingering or residual doubt as to Mr. Belt's guilt.
"2. Mr. Belt faces a substantial sentence of up to life in prison on each count of the six rape charges currently pending, if convicted.
"3. A term of imprisonment is sufficient to defend and protect the people's safety from Mr. Belt.
"4. You may consider in this regard Mr. Belt's current age, that being 42 years of age.
"5. Mr. Belt has a father and two sons that regularly visit him while he is incarcerated. Each relative will continue to visit and support him."

20

Neither party presented new evidence in support of the aggravating or mitigating circumstances. The jury returned a death sentence, finding beyond a reasonable doubt that the State had proved the existence of both alleged aggravating circumstances and that they outweighed mitigating circumstances found to exist. The district judge imposed a sentence of death on Count I, capital murder; 228 months on Count II, attempted rape; and 61 months on Count IV, aggravated arson. The sentences were ordered to run consecutively.

Belt died in prison on April 13, 2016.

SUFFICIENCY OF EVIDENCE ON CAPITAL MURDER

Our standard of review for appellate challenges to the sufficiency of the evidence to support a conviction is well known and often recited:

> "'When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.'" *State v. Woods*, 301 Kan. 852, 874, 348 P.3d 583 (2015) (quoting *State v. Lloyd*, 299 Kan. 620, 632, 325 P.3d 1122 [2014]).

To secure a capital murder conviction in this case, the State had to prove beyond a reasonable doubt that Belt intentionally, and with premeditation, killed L.G. in the commission of, or subsequent to, the crime of attempted rape. See K.S.A. 21-3301 (Furse); K.S.A. 21-3439(a)(4) (Furse); K.S.A. 21-3502(a)(1)(A) (Furse). In order to establish an attempted rape, the State had to prove that Belt committed an overt act with the intent to commit a rape but failed to complete the crime. See K.S.A. 21-3301 (Furse)

21

("An attempt is any overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof or is prevented or intercepted in executing such crime."); *State v. Ortega*, 300 Kan. 761, 770, 335 P.3d 93 (2014) (overt act must extend beyond mere preparation).

This court has held that a charge of attempted rape may be established without evidence of attempted penetration and that even the gravest offense may be sustained by circumstantial evidence. *State v. Lowrance*, 298 Kan. 274, 296-97, 312 P.3d 328 (2013). Each case is dependent on its particular facts and the reasonable inferences the jury may draw from those facts; it is the jury's function to determine whether an overt act occurred. *State v. Peterman*, 280 Kan. 56, 61, 118 P.3d 1267 (2005). In the context of attempted rape, "Kansas appellate courts have interpreted broadly the overt act requirement." *State v. Zimmerman*, 251 Kan. 54, 60, 833 P.2d 925 (1992); see *State v. Salcido-Corral*, 262 Kan. 392, 398, 940 P.2d 11 (1997) (discussing cases).

The parties appear to agree that the overt act relied on by the State was the removal of L.G.'s clothing. Belt argues that the "evidence was insufficient to establish that the removal of [L.G's] clothing was done with the intent to commit a rape." The State contends that Belt is asking this court to reweigh the evidence, viewing it in a light most favorable to the defense, which is not the correct standard.

The State compares the evidence in this case to that marshaled by the prosecution in *State v. Gonzales*, 245 Kan. 691, 783 P.2d 1239 (1989), where the defendant was convicted of both felony murder based on an underlying felony of attempted rape and of the attempted rape itself.

The body of the female victim had been found in a cornfield near Garden City. She had been stabbed multiple times. The victim was naked from the waist down, and her oxford shirt had been ripped open. Her bra was soaked in blood and appeared to be

22

slashed, and her blood-soaked jeans, baseball cap, underwear, and shoes were found in the general area of her body. Investigators found semen on the victim's thigh.

The defendant had been linked to the victim by the defendant's friend. At trial, the friend testified that he and the defendant had gone to the county fair. While at the fair, the defendant saw the victim and told his friend that "'he was going to try to get it'" and the defendant called out to the victim. 245 Kan. at 692. Later, the friend testified, the defendant and the victim walked together to a parking lot.

Photographic evidence and testimony at trial indicated that the victim had been laid on her back. Imprints in the dirt around the body indicated that the victim's legs had been spread and someone had knelt between them. There were handprints on one side of the body.

On appeal, the defendant argued there was insufficient evidence presented to prove that the murder was committed while in the commission of an attempted rape. The defendant contended that he had been improperly charged because the evidence was more consistent with an attempt to sodomize the victim. A letter admitted at trial indicated that the defendant had confessed to a cellmate that he had killed the victim because she had refused to engage in anal sex.

In response, this court pointed out that evidence in the record of the defendant's attempt to sodomize the victim did not preclude a finding that he also attempted to rape her. On the issue of the defendant's intent, the court noted that the defendant's friend had testified that he and the defendant were walking around the fair "with the hopes that they might 'get lucky.'" 245 Kan. at 697. The court also noted: semen was found on the victim's inner thigh; her bra had been cut open in front and blood smeared over her breasts; her underwear had been ripped or cut off; the back of her legs and buttocks were covered with caked dirt; the majority of her wounds were sustained in a frontal attack;

23

and the photograph and testimony at trial were consistent with an intent to rape. The court concluded that "the evidence was sufficient to convince the jury that the defendant attempted to rape the victim." 245 Kan. at 697-98.

Two other, more recent cases are also helpful to our evaluation of this issue: *State v. Longoria*, 301 Kan. 489, 343 P.3d 1128 (2015), and *Lowrance*, 298 Kan. 274.

In *Longoria*, employees at an asphalt plant found the burnt remains of a 14-year-old girl. A jury convicted the defendant, an employee of the plant, on three alternative counts of capital murder. Each alternative count alleged that the defendant had intentionally and with premeditation killed the victim, but each relied on a distinct underlying sex offense: (1) attempted rape, (2) criminal sodomy, and (3) aggravated criminal sodomy. On appeal, the defendant argued that the State had failed to present sufficient evidence of either attempted rape or sodomy.

Reviewing the evidence, this court first noted that the defendant had sent the victim several text messages. In the messages, the defendant "clearly expressed his attraction to [the victim], who he called beautiful, hot, and awesome; he repeatedly asked for pictures; he asked to 'date' her; and he lured and pursued her for over a month despite her frequent cold shoulder." 301 Kan. at 533. This court concluded that the messages were strong evidence of sexual intent. 301 Kan. at 533.

Reasonable inferences drawn from DNA evidence collected from a vehicle supported the State's theory that the defendant had sodomized the girl in the vehicle. Investigators found a DNA stain that contained a mixture of the defendant's semen and the victim's bodily fluid on a floor mat in the vehicle. During closing argument, the prosecutor argued that the stain was the result of the defendant penetrating the victim's mouth with his penis and then the victim spitting the mixture on the floor mat. This court noted that "[f]orensic testing and the resulting expert opinions neither established that this

24

scenario had occurred nor eliminated the scenario as a possibility." 301 Kan. at 533-34. And although a presumptive test came back negative for saliva, this court explained that the test merely meant forensics could not verify the bodily fluid from the victim was saliva. It did not mean that the bodily fluid was not, in fact, saliva. Thus, "the scientific evidence supported the State's theory and nothing negated the inference the State asked the jury to draw." 301 Kan. at 534.

Reviewing this evidence in a light most favorable to the State, this court concluded that the evidence was sufficient for the jury to conclude beyond a reasonable doubt that the defendant had committed the crime of sodomy or aggravated sodomy on the night of the victim's murder. 301 Kan. at 535.

We also rejected the defendant's claim that the evidence was insufficient to support a conviction on the basis of an attempted rape:

"In asserting the insufficiency of the evidence, [the defendant] notes that [the victim]'s body was found fully clothed. And while he concedes that [the victim]'s shorts were unbuttoned, he argues no other evidence suggests he took any action toward the completion of the crime of rape. In response, the State emphasizes the presence of duct tape residue on [the victim]'s mouth and legs that provides evidence of force and, thus, of an overt act toward the commission of rape. Further, the sexual overtone of [the defendant]'s text messages suggests he acted with a sexual intent when he drove [the victim] to a remote location and bound her mouth, nose, and legs. This suggestion is reinforced by the desecration of [the victim]'s genital and anal area. Although all of [the victim]'s body was badly burned, her genital and anal area and the organs therein were completely burned away. This desecration also suggests [the defendant] intended to destroy evidence by assuring that vaginal and anal swabs for biological evidence could not be obtained. The destruction and concealment of evidence leads to an inference of a plan or premeditation. See *State v. Scott*, 271 Kan. 103, 110, 21 P.3d 516 (2001). In combination, this evidence is sufficient to convince us that a rational factfinder could

have found [the defendant] guilty of the crime of attempted rape." *Longoria*, 301 Kan. at 535-36.

Similarly, in *Lowrance*, the defendant attacked the sufficiency of the evidence supporting his capital murder conviction premised on an underlying felony of attempted rape. The defendant argued that there was no evidence that he had committed an overt act toward the commission of rape.

Testimony at trial indicated that the victim had gotten "'pretty drunk'" at a party and fallen asleep. 298 Kan. at 277. According to witnesses, the defendant was "'pretty persistent'" on taking the victim home. 298 Kan. at 277. The defendant shook the victim awake, helped her stand up, held her upright as she stumbled to his car, and helped her into his car. One of the party attendees testified that he thought the defendant was "'trying to get some,' meaning that [the defendant] planned to have a sexual encounter with [the victim]." 298 Kan. at 277.

Two weeks after the party, the victim's body was discovered submerged in a nearby river after the defendant confessed to throwing her body from a bridge. A cell phone charger cord was wrapped tightly around her neck and tied in a knot. The victim was naked from the waist down. The victim's blood-alcohol level was twice the legal limit. The deputy coroner concluded that the victim died from strangulation. There were no obvious contusions or lacerations of the victim's genital area.

The defendant's sufficiency argument was premised on the fact that there was no physical evidence of sexual trauma to the victim or incriminating DNA evidence derived from the victim's bodily fluids. This court rejected the defendant's argument, noting first that a charge of attempted rape may be established without evidence of attempted penetration. 298 Kan. at 296-97 (citing cases). The court also emphasized that "it is well established that a conviction for even the gravest offense may be sustained by

26

circumstantial evidence." 298 Kan. at 297; see *State v. Richardson*, 289 Kan. 118, 127, 209 P.3d 696 (2009) (circumstances in question must themselves be proved and cannot be inferred or presumed from other circumstances). The court also rejected the defendant's argument that the jury would have had to stack inferences in order to convict him. Specifically, the defendant had argued that "the lone fact [the victim] was found unclothed from the waist down did not allow an inference that [the defendant] was involved in the removal of the clothing for the purpose of sexual activity or that he did so without [the victim's] consent." *Lowrance*, 298 Kan. at 297.

On this point, this court explained that the jury did not have to infer it was the defendant who had removed the victim's clothing in order to find he committed an attempted rape. Instead, this court held that direct evidence supported the jury's verdict:

> "Overt acts toward the commission of the crime of rape were established by direct evidence that [the defendant] retrieved his car, virtually carried [the victim] to the passenger seat, and drove her where the two could be alone. This was evidence from which intent could be inferred—as [a witness] stated, that [the defendant] was planning 'to get some'—and evidence of overt acts in furtherance of that intent. See *Peterman*, 280 Kan. at 64 (defendant's act of driving to meet someone to pick up a child he intended to have sexual intercourse with constituted an overt act). While intent had to be inferred, the act did not. Such actions—escorting someone home or preparing for sexual acts—will not always lead to attempted rape. What sets this case apart is the apparent inability of [the victim] to consent. As in *Peterman*[, 280 Kan. at 60-61,] where the driver went to pick up a child who was incapable of legal consent, here there was forensic evidence, specifically blood test results, establishing that [the victim] was incapable of legally consenting. See K.S.A. 21-3502(a)(1)(C). Her apparent drunkenness also made this obvious. Yet, despite [the victim's] apparent inability to consent, [the defendant] took steps toward the commission of an act that is statutorily defined as a crime." 298 Kan. at 297-98.

27

Returning to the circumstantial evidence, the court then discussed the defendant's former girlfriend's testimony that she and the defendant would occasionally engage in consensual sex in the defendant's car parked by the river. The former girlfriend said she would undress from the waist down. The location of the couple's sexual encounters was a few miles from the bridge where the defendant confessed to throwing the victim's body in the river. This court explained that this testimony strengthened the inference that the defendant intended to have sex with the victim and that the defendant had taken steps toward acting on that intent. The court noted that "simply because various circumstances independently lead to the same inference does not mean inferences have been stacked." 298 Kan. at 298.

Finally, this court explained that the possibility that the victim had voluntarily removed her clothing herself did not prevent the jury from concluding that the defendant had taken steps toward the commission of rape. This court stated that there was direct evidence that the victim was intoxicated and thus legally incapable of consenting. 298 Kan. at 298 (citing K.S.A. 21-3502[a][1][C]). Thus, "even assuming [the victim's] partial nakedness resulted from her own actions, the jury could have determined that an overt act toward the commission of rape—a voluntary sexual act by one incapable of legal consent—had occurred." 298 Kan. at 298.

The nature and amount of evidence in this case is similar to the nature and amount in *Gonzales*, *Longoria*, and *Lowrance*. It supported both intent to rape and the overt act alleged by the State, *i.e.*, the removal of L.G.'s clothing.

Belt told investigators that he had attempted unsuccessfully to "hook up" with L.G. in the past and that, on the night she was killed, he had begun following L.G. and then went to meet her at the vacant apartment for some "hanky panky." He admitted to engaging in certain sexual activities with L.G., although he insisted those activities were consensual, and said that L.G. put a stop to those activities because of Branch. Similar to

28

the text messages in *Longoria* and the defendant's insistence on taking an obviously intoxicated female party attendee home alone in *Lowrance*, this evidence supported the existence of sexual intent.

Belt's sexual intent also could be inferred from the facts that L.G.'s body was completely naked when it was discovered and that DNA testing on a sample from L.G.'s underwear, found in the bedroom with her body, could not eliminate Belt as a contributor. The mutilation of the genital and anal areas of L.G.'s body after death and the attempt to burn the body also support an inference that her killer acted with sexual intent. See *Longoria*, 301 Kan. at 535-36.

The evidence also was plainly sufficient, despite being circumstantial, to support the overt act alleged by the State. Again, L.G.'s body was completely unclothed. Her clothing was blood-stained, indicating that it remained on her body for some duration during the attack and then was removed. Her shirt had been cut off. And, perhaps most pertinent, DNA consistent with Belt's was found on specific areas of items of L.G.'s clothing that were likely to have been touched or handled by a person who was undressing her.

Belt's arguments to the contrary are unpersuasive. He first urges us to focus on inconsistencies and other weaknesses in portions of the evidence included in the State's case, but these inconsistencies and weaknesses were explored before his jury. It was the jury's job to weigh competing evidence, and we are not free to reweigh it on appeal. See *State v. Charles*, 304 Kan. 158, 172, 372 P.3d 1109 (2016). Belt also argues that all of the K.S.A. 60-455 evidence admitted on the six rapes committed from 1989 to 1994 was irrelevant to the charges in this case and thus admitted in error. Even if we assume the merit of his K.S.A. 60-455 argument at the time of his trial, we have not considered any of the evidence on those other crimes in our sufficiency analysis.

29

Belt is not entitled to reversal of his capital murder conviction because of insufficient evidence of the attempted rape on which that conviction depends.

## SUFFICIENCY OF EVIDENCE ON LEVEL THREE AGGRAVATED ARSON

Our standard of review on this issue is the same as the standard of review on the previous issue.

Under K.S.A. 21-3719(a) (Furse), "[a]ggravated arson is arson, as defined in K.S.A. 21-3718 and amendments thereto, and committed upon a building or property in which there is a human being." The statute assigns two different severity levels. If the aggravated arson "result[s] in a substantial risk of bodily harm," then the crime is a severity level 3 person felony. K.S.A. 21-3719(b)(1) (Furse). If there is no substantial risk of bodily harm, then the crime is a severity level 6 person felony. K.S.A. 21-3719(b)(2) (Furse).

Belt concedes that there was sufficient evidence of arson and that people were inside the apartment complex at the time the fires were started. He nevertheless claims on appeal that the evidence at trial was insufficient to prove that the fires "result[ed] in a substantial risk of bodily harm." K.S.A. 21-3719(b)(1) (Furse). Thus his aggravated arson conviction should have been classified as a severity level 6 person felony rather than a severity level 3 person felony.

Belt relies on *State v. Grant*, No. 99,375, 2009 WL 1591396 (Kan. App. 2009) (unpublished opinion). In *Grant*, a jury convicted the defendant on three counts of severity level 3 aggravated arson. On appeal, a panel of the Court of Appeals vacated the defendant's sentence for one of the three convictions and remanded the case for resentencing for a severity level 6 aggravated arson. The panel concluded that the

evidence at trial failed to prove that one of the fires at issue resulted in a substantial risk of bodily harm. 2009 WL 1591396, at *6.

The prosecution in *Grant* stemmed from the defendant's three drunken efforts to set fire to a house from which he had been kicked out earlier in the evening. The defendant told the remaining occupants that he would "'burn [them] out.'" 2009 WL 1591396, at *1. Then, later, the defendant returned to the house and rang the doorbell. When one of the occupants answered, the defendant said, "'[T]he basement is on fire,'" and, "'I guess you must want to die tonight.'" 2009 WL 1591396, at *1. Eventually, the occupants smelled smoke coming from the basement, and they discovered that a basement window was broken and a fabric curtain was on fire on the floor. One of the occupants extinguished the fire while the other called the fire department. Within a few minutes, the firefighters arrived, determined the fire was completely extinguished, and determined it had been intentionally set.

After the firefighters left, the defendant returned and rang the doorbell again. The defendant was refused entry, and he responded by breaking windows and using his cigarette lighter to ignite a blanket hanging over a bedroom window. As before, one of the occupants extinguished the fire; firefighters arrived, investigated, and left.

Later that night, after the occupants had fallen asleep, they were awakened by black smoke. The occupants could not control this fire, so they left the house. The occupants saw the defendant running from the back of the house with a container. The defendant yelled, "'[S]ee if you can put this MF out now.'" 2009 WL 1591396, at *1. Eventually the fire was put out.

The State charged the defendant with three counts of severity level 3 aggravated arson, and the jury convicted him on all three charges. On appeal, the panel stated that in order to distinguish between severity level 3 and severity level 6 aggravated arson, "the

31

State must produce evidence of a substantial risk of bodily harm beyond the risk of attending a fire intentionally started in a building or property in which there is a human being present." 2009 WL 1591396, at *6. Ultimately, the panel concluded there was no such evidence with respect to Count 1, which was based on the first fire. The panel tied this result to the fact that the defendant had informed the occupants of the fire. 2009 WL 1591396, at *6.

On this appeal, Belt makes the correct observation that "[n]ot every fire that is set in an occupied building actually results in a substantial risk of bodily harm." The legislature recognized as much when it divided aggravated arson into two severity levels based on whether the aggravated arson resulted in a substantial risk of bodily harm. But Belt's contention that the evidence in his case failed to support a finding that the fire created a substantial risk of bodily harm is incorrect, and *Grant* does not support his position.

There is no dispute that the apartment building in which the fires in this case were set was occupied by persons other than the arsonist and L.G. or her body. And the arsonist here made no effort to inform or warn any of these others of the danger. This fact alone makes *Grant* distinguishable. We also note that there was abundant evidence of the use of an accelerant, which increases the risk of a fire catching and spreading. There was also evidence that the fires were left unattended and continued to smolder until the next morning, creating enough smoke to repeatedly activate the smoke detector and alert the resident of an adjacent apartment. The fires left behind significant damage to the living room, bedroom, and L.G.'s body.

That the flame retardant carpet was successful in limiting the damage does not negate the fact that, when set, the fires in the apartment created a substantial risk of bodily injury to the other occupants of the apartment building. *Cf. State v. Foster*, 290 Kan. 696, 725, 233 P.3d 265 (2010) (defendant poured alcohol on corpse and threw

burning washcloth on body starting a fire inside an occupied duplex; State charged aggravated arson and prosecutor argued that fire created substantial risk of bodily harm by smoke inhalation to neighboring apartment residents; court held permissible argument based on evidence). Lack of success in causing bodily injury to others does not mean a substantial risk of such injury was not incurred.

When viewed in a light most favorable to the State, the evidence was sufficient to support Belt's conviction of level three aggravated arson.

MULTIPLICITY OF ATTEMPTED RAPE

Questions involving multiplicity are questions of law subject to unlimited appellate review. *State v. Holman*, 295 Kan. 116, 147, 284 P.3d 251 (2012).

The State concedes that *State v. Appleby*, 289 Kan. 1017, 1030, 1033, 221 P.3d 525 (2009), requires that Belt's attempted rape conviction be reversed and that sentence vacated.

In *Appleby*, this court held:

"When capital murder is charged under K.S.A. 21-3439(a)(4), the State must prove beyond a reasonable doubt that the defendant intentionally and with premeditation killed a victim in the commission of, or subsequent to, the commission of one of the sex crimes listed in the statute, which includes attempted rape as defined in K.S.A. 21-3301 and K.S.A. 21-3502. Hence, all of the elements of the underlying sex crime are some of the elements of the capital murder, meaning the specified sex crime is a lesser included offense. As a result, under K.S.A. 21-3107, a count charging capital murder under K.S.A. 21-3439(a)(4) is multiplicitous with a count charging the underlying sex crime, and imposing sentences for both convictions violates a defendant's rights to be free from

33

double jeopardy as guaranteed by the Fifth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights." 289 Kan. 1017, Syl. ¶ 7.

The State charged Belt with capital murder under K.S.A. 21-3439(a)(4). Belt and the State are correct that Belt's conviction for attempted rape was multiplicitous with his capital murder conviction. That conviction must be reversed and the sentence for it vacated.

CONCLUSION

Defendant Douglas Belt's death in prison limits the issues reached by the court in this direct appeal from a capital case to three. We affirm the conviction for capital murder and the conviction for level three aggravated arson. The evidence in the record on appeal was sufficient to support both crimes, even when evidence of prior rapes admitted under K.S.A. 60-455 is not considered. We reverse Belt's conviction for attempted rape and vacate the sentence for that crime, because that conviction was multiplicitous with his conviction for capital murder.

\* \* \*

LUCKERT, J., dissenting: For the reasons more fully explained in my dissent in *State v. Hollister*, 300 Kan. 458, 472-74, 329 P.3d 1220 (2014), I dissent. I would follow the lead of the federal courts and most other courts and apply the doctrine of abatement *ab initio*.

34